# COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

Name: ___Lee_____John_____Henry_____

     *(Last)*             *(First)*          *(Middle Initial)*

Prisoner Number: ___AW0379_____

Institutional Address: __Califdornia Helath Care Facility E-4-B P.O. Box 32290__

___Stockton,   CA  (5213___

FILED

APR - 6 2018

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JCS

John Henry Lee,
*(Enter your full name.)*

vs.

Danny Mally,

K-9 Rohan,

Detective Johnson
*(Enter the full name(s) of the defendant(s) in this action.)*

C V 18 2109

(PR)

Case No. _____
*(Provided by the clerk upon filing)*

**COMPLAINT UNDER THE
CIVIL RIGHTS ACT,
42 U.S.C. § 1983**

## I. Exhaustion of Administrative Remedies.

<u>*Note:*</u> *You must exhaust available administrative remedies before your claim can go forward. The court will dismiss any unexhausted claims.*

A. Place of present confinement __California Health Care Facility__ (CHCF)

B. Is there a grievance procedure in this institution?   YES ☐    NO ☑

C. If so, did you present the facts in your complaint for review through the grievance procedure?   YES ☐   NO ☑

D. If your answer is YES, list the appeal number and the date and result of the appeal at each level of review. If you did not pursue any available level of appeal, explain why.

      1. Informal appeal: ___None Applicable_____

_____

_____

2. First formal level: _____none_____

_____

_____

3. Second formal level: __none_____

_____

_____

4. Third formal level: ___none_____

_____

_____

E.   Is the last level to which you appealed the highest level of appeal available to you?

     YES ☐     NO ☐

F.   If you did not present your claim for review through the grievance procedure, explain why.

Plaintiff's contends that his civil rights violation stemms from a policy,

regulation, or customs from the Sheriff's academy and the municipality of

of Oakland, CA and the training of K-9 dogs and the use of excessive force.

## II.   Parties.

A.   Write your name and present address.  Do the same for additional plaintiffs, if any.

John  Henry Lee,

_____

_____

B.   For each defendant, provide full name, official position and place of employment.

Danny Mally,

K-9 Rohan,

Detective Johnson, after Plaintiff finds out Johnson first name he will amend.

Does 1-through 100

_____

_____

SEE Attached Exhibit

**III. Statement of Claim.**

State briefly the facts of your case. Be sure to describe how each defendant is involved and to include dates, when possible. Do not give any legal arguments or cite any cases or statutes. If you have more than one claim, each claim should be set forth in a separate numbered paragraph.

Plaintiff contends that he was a suspect fleeing from a crime scene and for running away, Defendant Mally ordered his partner Defendant K-9 Rohan to viciously attack and bit Plaintiff on his bicep arm for three to four minutes, Defendant Mally told Plaintiff that should teach Plaintiff from running from the police. Next, while Plaintiff layed on the ground screaming in pain, Defendant Mally ordered Defendant K-9 to release his bit on Plaintiff's arm and reordered Defendant K-9 to bite Plaintiff on his thigh to secure plaintiff lower extermities from moving. Then Defendant Mally and Johnson used unreasonable use of excessive force on Plaintiff, to which, Plaintiff was beat and stomped and kicked in his and face, to which Plaintiff sustained a broken jaw injury to which he had to have his mouth wired where Plaintiff had to undergo emergency surgery, Plaintiff developed post-E-N-T complication in the form of chronic pain and post traumatic stress disorder.

**IV. Relief.**

Your complaint must include a request for specific relief. State briefly exactly what you want the court to do for you. Do not make legal arguments and do not cite any cases or statutes.

Plaintiff seeks Medical/Dental/Psychiatrict Care for the rest of his life; Plaintiff seeks monetary compensation in the form of $1.5,000,000, for pain and suffering; Plaintiff seeks Punitive Damages $3.5,000,000 in tripple, as a direct result of the willfulness, malicious and reckless criminal intent to cause Plaintiff to incurr his physical injury; Plaintiff seeks both emotional distress injury; the cost of the court, and attorney fee's.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on: x _____          x _____

*Date*                              *Signature of Plaintiff*

# EXHIBIT COVER PAGE:

**Exhibit** _A_

**Description of this exhibit:** _Superior court Transcripts_

**Number of pages for this exhibit:** _4_

1   Q.      What did you do next?

2   A.      I called my partner to me, my K-9 partner, and I gave

3   him -- as suspect was running up 5th Avenue, I gave my K-9

4   partner the command to apprehend.

5   Q.      Now, how far away from you was the driver of the car

6   when you released the K-9 unit?

7   A.      About 30 feet.

8   Q.      And do you see the driver of the car in court today?

9   A.      I do.

10  Q.      Can you please point him out and tell me what he's

11  wearing?

12  A.      Seated to my left wearing yellow.

13          MS. KRAMER:  Your Honor, may the record reflect the

14  witness has identified the defendant?

15          THE COURT:  Yes.

16          MS. KRAMER:  Q.  So did you begin to chase the

17  defendant on foot?

18  A.      Yes.

19  Q.      And what happened after you and the K-9 unit began

20  chasing the defendant?

21  A.      At about that time Officer Aldred pulled up and he and

22  I both began running after the dog and the suspect.

23  Q.      Now, why did you release the K-9 unit on the

24  defendant?

25  A.      I bullet pointed several reasons in my report.  First

26  and foremost, he had committed at that point at least two

27  serious crimes, which was reckless evasion and he was in

28  possession of a stolen vehicle.

1          Second was that he was running after I gave him

2    commands to stop, so he was resisting my efforts to take him

3    into custody by running away.

4    Q.     Now, did Officer Aldred join you in the chase after he

5    arrived?

6    A.     Yes.

7    Q.     And total, how many times did you yell for the

8    defendant to stop?

9    A.     At least twice.

10   Q.     Where did the defendant run?

11   A.     He ran -- compass-wise it would be about northbound

12   onto 5th Avenue.

13   Q.     And what happened when he got onto 5th Avenue?

14   A.     My dog caught up to him.

15   Q.     Where was he when your dog caught up to him?

16   A.     He was just starting to climb a cyclone fence on the

17   west side of the street.

18   Q.     Now, did you see your dog bite the defendant?

19   A.     Yes.

20   Q.     Where on his body did the dog bite the defendant?

21   A.     On his right arm.

22   Q.     And how far up the fence was the defendant when your

23   dog bit him?

24   A.     Not very far.  I think he was just starting to climb it

25   from street level, so I don't think he even made it very far

26   up the fence.

27   Q.     And what happened after you saw the dog bite his right

28   arm?

1  A.     I didn't write anything down.

2         MR. MORRIS:  Thank you, your Honor.  Nothing further.

3         THE COURT:  All right.  Thank you.  Any redirect?

4         MS. KRAMER:  No, thank you, your Honor.

5         THE COURT:  May this detective be excused?

6         MS. KRAMER:  Yes, thank you.

7         MR. MORRIS:  Yes.

8         THE COURT:  Thank you very much, Detective.

9         MS. KRAMER:  The People call Officer Mally.

10        THE CLERK:  Officer, if you could stand right here and

11 I'll get you all sworn in.  Please raise your right hand.

12                     DENNIS MALLY,

13                  Was called to testify

14                      by the People

15        THE WITNESS:  "I do."

16        THE CLERK:  Thank you.  If you could state your full

17 name for the record and spell both your first and last name,

18 please.

19        THE WITNESS:  Dennis Mally, D-e-n-n-i-s M-a-l-l-y.

20        THE CLERK:  Thank you.  You may be seated.

21                   DIRECT EXAMINATION

22        MS. KRAMER:

23 Q.     Good afternoon, Officer Mally.

24 A.     Good afternoon.

25 Q.     What is your occupation?

26 A.     Police officer.

27 Q.     And by whom are you employed?

28 A.     City of San Leandro.

1   Q.      Now, if you could just slow down a little bit for the
2   court reporter here.
3           How long have you been an officer with San Leandro?
4   A.      Just about eight years.
5   Q.      Can you briefly describe your training in becoming an
6   officer with San Leandro?
7   A.      I attended a police academy for the Alameda County
8   Sheriff's Office in Dublin from 2005 and graduated in 2006.
9   It was about a seven-month course.
10  Q.      Now, do you currently work with a K-9 dog, Officer?
11  A.      Yes.
12  Q.      And what is the name of the K-9 you work with?
13  A.      Rohan.
14  Q.      Can you describe your training in becoming a K-9,
15  Officer?
16  A.      Training for becoming a K-9 officer included going to
17  K-9 school with him, which is a five-week course, and there's
18  ongoing monthly training which is a minimum of 16 hours per
19  month.
20  Q.      And how long have you been working with K-9 Rohan?
21  A.      About 15 months.
22  Q.      Now, were you working on January 16th, 2014 at
23  approximately 12:13 a.m.?
24  A.      Yes.
25  Q.      Where were you?
26  A.      At that time I was in the area of East 14th Street and
27  Hesperian Boulevard.
28  Q.      And is that in Alameda County?

1   A.      Yes.

2   Q.      Were you in a marked patrol car?

3   A.      Yes.

4   Q.      Were you in full uniform?

5   A.      Yes.

6   Q.      Did anything happen that caught your attention at that

7   time?

8   A.      Yes.

9   Q.      What was that?

10  A.      Officer De Grano broadcast that he was in the area

11  of -- I believe it was Dolores and Bancroft Avenues, and he

12  was trying to stop a car that was starting to take off from

13  him.

14  Q.      Did he provide information about what kind of car he

15  was trying to catch up to?

16  A.      Yes.

17  Q.      What kind of car was that?

18  A.      It was a white Honda Accord.

19  Q.      And did you begin to keep an eye out for this car?

20  A.      Yes.

21  Q.      What did you do?

22  A.      I drove northbound up Bancroft Avenue towards the area

23  of Dolores.

24  Q.      Now, had you received any information from BART earlier

25  in the day on January 15th?

26  A.      Yes.

27  Q.      What was that information?

28  A.      The vehicle that Officer De Grano was now starting to

1    pursue was involved in a robbery earlier in the day.

2           MR. MORRIS:   Object to hearsay; ask the answer be

3    stricken.

4           THE COURT:   Overruled.

5           MS. KRAMER:   Q.   And was a suspect description provided

6    in that BART information?

7    A.      Yes.

8    Q.      What was that description?

9    A.      The suspect description given was a black male about 18

10   to 20 years old, wearing dark clothing.

11   Q.      Were there any more specifics about the person's height

12   or build given?

13   A.      Not that I can remember.

14   Q.      Now, what did you do after getting the call from

15   Officer De Grano?

16   A.      I drove towards the area as the pursuit began.

17   Q.      Now, at any point did you see officers chasing a car

18   that matched the white Honda Accord description?

19   A.      Yes.

20   Q.      Where were you?

21   A.      I was in the area of International Boulevard, which is

22   just East 14th Street, in our city becomes International

23   Boulevard into Oakland at the border and I was about 104th

24   Avenue and International.

25   Q.      And what did you see?

26   A.      At that time I saw a car coming westbound on 104th

27   towards International, which is where I was parked, and there

28   were several other San Leandro marked police patrol cars

1    pursuing the suspect vehicle.

2    Q.    So this car was coming at you?

3    A.    Yes.

4    Q.    And what color was this car?

5    A.    White.

6    Q.    And were you able to tell the make and model?

7    A.    Yes.

8    Q.    What was that?

9    A.    Honda Accord.

10   Q.    Now, from what you could see, were the lights and

11   sirens of the patrol cars following it on --

12   A.    Yes.

13   Q.    And approximately how many patrol cars did you see?

14   A.    I saw at least two or three.

15   Q.    What was traffic like at that time?

16   A.    Traffic conditions, very light.  There were very few

17   cars on the road.

18   Q.    Did the cars appear to be traveling at a high rate of

19   speed or slow rate of speed?

20   A.    Appeared it was a high rate of speed.

21   Q.    Now, did the Honda go past your location?

22   A.    Yes.

23   Q.    Were you able to see the driver when the Honda went

24   past your location?

25   A.    Very briefly.

26   Q.    And what were you able to see?

27   A.    I saw the driver of the car was a black male wearing a

28   dark -- I believe it was a sweatshirt.  It was dark clothing

1          Next Court Appearance:   4/10/14

2                              D.11, RCD, 9:01 a.m.
                                        ENDORSED
3                                         FILED
                                     ALAMEDA COUNTY

4                                    APR 0 9 2014

5                              CLERK OF THE SUPERIOR COURT
                               By    Nazreen Ismail
6          IN THE SUPERIOR COURT                      Deputy

7          STATE OF CALIFORNIA, COUNTY OF ALAMEDA

8              WILEY W. MANUEL COURTHOUSE

9                DEPARTMENT NUMBER 114

10     BEFORE:  HONORABLE KIMBERLY M. BRIGGS, JUDGE

11                    ---oOo---                173615

12  THE PEOPLE OF THE STATE OF CALIFORNIA,)     No. 593225
                                          )
13                            Plaintiff, )
                                          )
14           -vs-                         )
                                          )
15  JOHN HENRY LEE,                       )
                                          )
16                           Defendant. )
                                          )
17  _____)

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19     F U R T H E R   P R E L I M I N A R Y   H E A R I N G

20                (VOLUME 2 OF 2)

21          WEDNESDAY, MARCH 26th, 2014

22  APPEARANCES:

23  For the People:              KELLY KRAMER,
                                 Deputy District Attorney.
24

25  For the Defendant:           SETH MORRIS,
                                 Deputy Public Defender.
26

27  Reported By:  Renee E. Dayce,
                  C.S.R. No. 5854
28

I N D E X                                    i

PEOPLE VS. JOHN HENRY LEE - DOCKET NO. 593225


### INDEX OF WITNESSES

THE PEOPLE'S WITNESSES:                        PAGE

NANCY GEE

Direct Examination by Ms. Kramer            2

Cross-Examination by Mr. Morris             5

OFFICER TIMOTHY DEGRANO

Direct Examination by Ms. Kramer            8

Cross-Examination by Mr. Morris             14

Redirect Examination by Ms. Kramer          23

OFFICER DARYL PASUT

Direct Examination by Ms. Kramer            24

Cross-Examination by Mr. Morris             29

OFFICER DENNIS MALLY    (TESTIMONY RESUMED)

Cross-Examination by Mr. Morris             33

### INDEX OF EXHIBITS

FOR THE PEOPLE:                        I.D.      EVID.

People's 3    Copy of AFS Report        72        72

People's 4    Copy of 4-pg CI&I printout

                   for John H. Lee      72        72


FOR THE DEFENSE:

Defense A-M    (Color photos marked in Volume 1)      73

1  A.      Not that I remember.

2  Q.      Once Mr. Lee was on the concrete sidewalk, having been

3  taken down by your dog, was he on his back or on his chest --

4  Mr. Lee?

5  A.      All different positions.  It was -- he was moving all

6  around, resisting us, and shifting his body.

7  Q.      And did your -- was your K-9 also moving his head while

8  holding Mr. Lee's right arm in his mouth?

9  A.      Moving his head?

10  Q.      Yeah.  You've been trained that when a dog bites an

11  apprehension moved subject, sometimes they'll try to gain

12  control by moving his head.  The dog.  Shaking his head with

13  the object in its mouth, right?

14  A.      Have I been trained that?

15  Q.      Have you seen that?

16  A.      I've seen it.

17  Q.      Was he doing that to Mr. Lee?

18  A.      No, not that I remember.  He maintained his grip, and I

19  don't remember his head moving around except for moving with

20  his arm.

21  Q.      Mr. Lee --

22  A.      As his arm was moving, the dog's head was moving with

23  it.

24  Q.      I see.  Once Mr. Lee was on the concrete sidewalk and

25  his right arm was in your dog's mouth, did you say anything to

26  Mr. Lee?

27  A.      "Stop fighting with my dog."

28  Q.      At any point during this incident, the struggle with

1  Mr. Lee, did you whisper something in his ear?

2  A.    No.

3  Q.    Did you see Officer Aldred whisper in his ear?

4  A.    No.

5  Q.    Did you hear Officer Aldred tell Mr. Lee that he, Mr.

6  Aldred -- excuse me.  Officer Aldred, wished he would have

7  died?

8  A.    No.

9       MS. KRAMER:  Objection.  Hearsay.

10      MR. MORRIS:  It's not being offered for the truth at

11  this point.  It's, rather, a state of mind and it's a

12  question.

13      MS. KRAMER:  I believe the Officer testified he didn't

14  hear anything being said.

15      THE COURT:  Sustained.  And it goes to the other

16  officer's state of mind.

17      MR. MORRIS:  Q.  Did you -- I know sometimes, in a time

18  of apprehension, an officer will use aggressive verbal

19  language to gain control over a subject, right?

20  A.    Are you asking, can we?

21  Q.    Do you?

22  A.    Have I?  Or did I in this particular incident?

23  Q.    Well, first I'll ask, do you normally?

24  A.    Not normally, no.

25  Q.    In this particular incident, did you use any aggressive

26  language towards Mr. Lee?

27  A.    No.

28  Q.    Did you use any swear words?

1  A.      No.

2  Q.      Did you call him a bitch?

3  A.      No.

4  Q.      Do you remember Mr. Lee telling you that he was losing

5  feeling in his right arm?

6  A.      No.

7  Q.      You said yesterday that during the struggle with Mr.

8  Lee, you were trying to gain control of Mr. Lee "any way we

9  could".  Do you remember saying that?

10 A.      Yes.

11 Q.      And as Mr. Lee was being bitten by your dog, Mr. Lee

12 was struggling.

13 A.      Yes.

14 Q.      And you were trying to get handcuffs on him; is that

15 right?

16 A.      Yes.

17 Q.      I guess before you got handcuffs on him, you were

18 trying to subdue him.

19 A.      Yes.

20 Q.      To gain physical control.

21 A.      Yes.

22 Q.      So what did you personally do once Mr. Lee was on the

23 ground to gain physical control of him?

24 A.      Tried to gain control of his left arm.

25 Q.      I know, but what did you do?

26 A.      I attempted to grab it several times.

27 Q.      Do you use your hands --

28 A.      Yes.

1  Q.      -- to try to grab his left -- was it arm, finger?

2  A.      Arm, wrist, gain control of his left arm.

3  Q.      While you were doing that, what were you doing with the
4  rest of your body?

5  A.      Either kneeling, crouching, bent over.  I was next to
6  him.

7  Q.      Did you use your body weight on him at all?  Did you,
8  you know, sit on him?  Did you put your knees into him?

9  A.      Not that I remember.

10 Q.      Were you -- he was on the ground.  Did you get on the
11 ground with him like on your knees?

12 A.      I believe at one point I knelt down or put -- had both
13 of my knees next to him.

14 Q.      At some point, your dog released Mr. Lee's right arm,
15 correct?

16 A.      Yes.

17 Q.      And could you tell why that was?  Was something
18 happening right then?

19 A.      Mr. Lee was kicking at him.

20 Q.      Mr. Lee had previously been punching at the dog?

21 A.      Yes.

22 Q.      Did you gain control of Mr. Lee's left arm so that he
23 couldn't do that at that time?

24 A.      No.

25 Q.      So which of Mr. Lee's legs was he using to kick the dog
26 who was holding onto his right arm?

27 A.      His right leg.

28 Q.      At that point when you say Mr. Lee was kicking at the

1  dog, was Mr. Lee on his back or on his stomach?

2  A.    Don't know what position he was in when he was kicking

3  at the dog.

4  Q.    And what did you do as a result of Mr. Lee kicking at

5  the dog?

6  A.    Told him to stop fighting my dog.

7  Q.    What did you physically do to Mr. Lee to enforce your

8  command?

9  A.    Nothing.

10  Q.    After your dog released Mr. Lee's arm, did you give a

11  command to your dog to bite Mr. Lee again?

12  A.    No.

13  Q.    The dog bit Mr. Lee again, though, right?

14  A.    Yes.

15  Q.    This time, in the right thigh or leg?

16  A.    Yes.

17  Q.    At that point, once the dog let go of Mr. Lee's arm and

18  started biting his leg, did you see blood coming out of Mr.

19  Lee's arm?

20  A.    No.

21      MR. MORRIS:  May I approach the witness, Your Honor?

22      THE COURT:  Yes.

23      MR. MORRIS:  Showing opposing Counsel what's been

24  marked as Defense M, L.

25      (DA's perusal of Defense Exhibits M and L).

26      MR. MORRIS:  Q.  Officer, I'm now showing you pictures

27  M and L.  Could you take a look at those for a moment and tell

28  us what you see.

1   A.      (Complying).  This is what appears to be a leg, and

2   the other appears to be either an elbow or a knee.

3   Q.      The first picture, which I think is M -- is that right?

4   A.      L.

5   Q.      Talking about L. first, do you see a puncture wound in

6   that picture?

7   A.      I do.

8   Q.      Does that look like a puncture wound caused by your dog

9   on Mr. Lee's body?

10  A.      Yes.

11  Q.      Does it look like the puncture wound that would have

12  landed on Mr. Lee's leg?

13  A.      Yes.

14  Q.      The next picture, which is M, I guess, do you see an

15  abrasion on the body part in that picture?

16  A.      Yes.

17  Q.      Do you remember how that abrasion was caused?

18  A.      No, I don't.

19  Q.      Does that look like Mr. Lee's knee?

20  A.      I can't tell if it's a knee or if it's an elbow.

21  It's definitely a joint of a body part.  Whether it's a leg

22  or an arm, I can't tell.

23  Q.      That's fine.  That's fine.  You testified yesterday

24  that after the K-9 bit Mr. Lee in the leg, you were able to

25  handcuff Mr. Lee, right?

26  A.      Yes.

27  Q.      How quickly was that?

28  A.      Within seconds.

1   Q.      But you also testified that the bite of the leg lasted

2   about 15 seconds?

3   A.      Yes.

4   Q.      So did the bit continue after Mr. Lee was in handcuffs?

5   A.      No.

6   Q.      So did it take about a few seconds to handcuffs Mr. Lee

7   or about 15 seconds?

8   A.      Ten or 15.

9   Q.      How were you involved in the handcuffing of Mr. Lee?

10  A.      By holding his left arm and helping Officer Aldred get

11  both hands handcuffed.

12  Q.      At that point, Mr. Lee was on his stomach?

13  A.      I believe so.

14  Q.      In order to handcuff him, you would bring his hands

15  behind his back, right?

16  A.      Typically, yes.

17  Q.      Is that what you did in this case?

18  A.      Yes.

19  Q.      And you brought Mr. Lee's left hand or arm behind his

20  back?

21  A.      Yes.

22  Q.      And Officer Aldred brought his right arm?

23  A.      Yes.

24  Q.      And at that point, where was Mr. Lee's head?  Was it

25  pressed up against the concrete sidewalk?

26  A.      It was on the sidewalk.

27  Q.      Did you use your body weight to control Mr. Lee by

28  leaning on him or sitting on him at that point?

1  A.      No.

2  Q.      Isn't it true, Officer, that during your struggle with

3  Mr. Lee, Officer Aldred ran up to Mr. Lee and kicked Mr. Lee

4  in the face?

5  A.      No.  Not that I saw.

6  Q.      And are you aware that Mr. Lee suffered a broken jaw in

7  this case?

8  A.      I heard that he did, yes.

9  Q.      Based on your own observations on scene, could you

10  tell, was there a moment that you saw where some force was

11  applied to Mr. Lee's body such that he might suffer a broken

12  jaw?

13  A.      No.

14  Q.      Now, part of your job as a K-9 officer is to document

15  the use of force after the dog's deployment, right?

16  A.      Yes.

17  Q.      And that's sort of a dual purpose of your police

18  report, right?

19  A.      Yes.

20  Q.      So in the police report, you go through your reasons

21  for using the dog and what the dog did; stuff like that,

22  right?

23  A.      Yes.

24  Q.      Um, is it part of your training as well to document the

25  injuries caused by the dog?

26  A.      Yes.

27  Q.      And to document the other injuries caused by other uses

28  of force at the time?

1  A.      If it's -- if the result is -- if the results of the

2  injury -- sorry.  If the injury is a result of my use of

3  force, yes, I will document it.

4  Q.      If you see an injury as a result of another officer's

5  use of force, do you choose not to document it?

6  A.      I leave that for them for their report.

7  Q.      Even if you saw it.

8  A.      Even if I see it.

9  Q.      And why is that?

10  A.      My purpose of my report is to document my involvement,

11  my observations.  The purpose of the other officer's report is

12  to do the same.

13  Q.      So if you observe another officer using force, that's

14  your own observation, right?

15  A.      Correct.

16  Q.      But you chose not to include that in your report.

17  A.      I leave that for them to put in their report, and I'll

18  refer to their report for the details.

19  Q.      Now, did every officer who arrived on scene in this

20  case write a report?

21  A.      I don't know.

22  Q.      I just want to be clear.  Have you been trained to not

23  include the use of force by other officers in hopes that they,

24  themselves, would include it in their own report?

25  A.      Yes.

26  Q.      And where did you get that training?

27  A.      My training has always been through my field training,

28  through my years of experience.  What that person does, what

1  you decide to do, you document your own report.  I'm not going

2  to write what someone else does unless it's major, something

3  else.  And in this situation, I left it up to the other

4  officers to document their own involvement.

5  Q.    My question was, where did you get that training?  Was

6  that at the Police Academy or through your field training?

7  A.    Through field training.

8  Q.    So time spent with veteran officers, they told you

9  that's how things are done.

10 A.    Yes.

11 Q.    Did you, in preparation for this case, or as part of

12 your investigation, review Officer Aldred's report?

13 A.    No.

14 Q.    So sitting here today, you don't know whether he

15 documented each one of his acts of physical contact against

16 Mr. Lee, correct?

17 A.    I don't know if he did or not.

18 Q.    But you know you didn't.

19 A.    I did not.

20 Q.    When documenting Mr. Lee's injuries in your police

21 report, you noted that Mr. Lee suffered bite marks and

22 puncture wounds on his right arm and his right thigh; is that

23 right?

24 A.    Yes.

25 Q.    Is that the limit of your -- extent of your notations

26 of his injuries?

27 A.    I believe so.

28 Q.    Did you -- you said today that you learned that he

```
 1   broke his jaw.  When did you learn that?
 2   A.      After the fact.
 3   Q.      Did you learn about any other injuries he suffered?
 4   A.      No.
 5   Q.      Did you amend your report to include the broken jaw?
 6   A.      No.
 7   Q.      Why not?
 8   A.      No reason.  I didn't do it.
 9           THE COURT:  Mr. Morris, we're going a little far
10   afield of what the Court needs to consider.
11           MR. MORRIS:  I'm almost done.
12           THE COURT:  Okay.
13           MR. MORRIS:  I think we'll be done in total if we
14   finish this morning.
15           THE COURT:  Okay.  Thank you.
16           MR. MORRIS:  Q.  Let me make sure I show you my final
17   picture.  I think you're the last witness.  May I approach,
18   Your Honor?
19           THE COURT:  Sure.
20           MR. MORRIS:  Showing opposing Counsel Defense F.
21           (DA's perusal of Defense F).
22           MR. MORRIS:  And approaching the witness.
23           THE COURT:  All right.
24           MR. MORRIS:  With Defense F.
25   Q.      Do you see that photograph I've handed you?
26   A.      I do.
27   Q.      What does that look like to you?
28   A.      It's Mr. Lee, lying on his back on a gurney, in what
```

1 | appears to be the hospital.

2 | Q.    Can you describe anything else you see about Mr. Lee

3 | in the picture?

4 |         MS. KRAMER:  Objection.  Relevance about what he sees

5 | and how this photo may relate to any evidence this witness is

6 | producing.

7 |         THE COURT:  Counsel?

8 |         MR. MORRIS:  I can lay more foundation if Ms. Kramer

9 | would like.

10 |         MS. KRAMER:  I just don't think it's relevant, what he

11 | sees.  Is there anything you want to ask him about what he

12 | knows about that photo?

13 |         MR. MORRIS:  I'll ask a couple of questions.

14 |         THE COURT:  The objection is sustained.

15 |         MR. MORRIS:  Q.  As a result of this incident, Officer,

16 | Mr. Lee was taken to the hospital; is that right?

17 | A.    Yes.

18 | Q.    And he was taken to the hospital to be treated for

19 | injuries relating to the car crash and also to the injuries

20 | related to the K-9 attack.

21 | A.    Yes.

22 | Q.    In the picture that you have in front of you, does that

23 | look like the picture of Mr. Lee in the hospital after he was

24 | taken there after he was arrested?

25 | A.    Yes.

26 | Q.    And you see that he has, like, a brace on his neck in

27 | the picture?

28 | A.    Yes.

1  Q.    And you can even see his right arm, some of the marks

2  that we talked about earlier.

3  A.    Yes.

4  Q.    Before you pulled your dog or gave your dog the command

5  to stop biting Mr. Lee, the dog was reaching or about to bite

6  Mr. Lee in the neck; isn't that right?

7  A.    No.

8  Q.    Mr. Lee suffered a scratch to his neck caused by one of

9  the dog's tooth, right?

10 A.    No.  Not that I saw.

11 Q.    Can you tell us where the dog was in terms of his

12 relationship to Mr. Lee's body when you finally took the dog

13 off Mr. Lee?

14 A.    It would have been on his right side, where he had just

15 been biting the right thigh.  I grabbed him by his collar and

16 stepped away from Mr. Lee.

17 Q.    And why do you grab the dog by the collar instead of

18 just giving a verbal command.

19 A.    I do both.

20 Q.    Why?

21 A.    To make sure that I have control of him.

22 Q.    But aren't your verbal commands -- don't they give you

23 full control of the dog?

24 A.    They do.

25 Q.    So why would you grab the dog?

26 A.    So that I can make sure that I maintain control over

27 him.

28 Q.    When you give verbal command to your dog in the middle

1  of apprehension, do you have doubts about whether or not he

2  will listen to your commands?

3  A.    No.

4        THE COURT:  Excuse me.  My Clerk has to leave at noon

5  for a very important meeting, so, we can either stop or we'll

6  put this over until 2:00 o'clock.

7        MR. MORRIS:  I think I'm satisfied, Your Honor, but I

8  would probably have to argue the holding order.

9        THE COURT:  That's fine.  We can't do this without a

10  Clerk being here, and Madam Clerk has tried to call a

11  replacement clerk.  She's not getting an answer.

12        MR. MORRIS:  I understand.

13        THE COURT:  So the attorneys can come back with Mr. Lee

14  at 2:00, if you're finished with this witness.

15        MR. MORRIS:  I see Mr. Lee has taken some notes, so

16  maybe out an abundance of caution, we should have the witness

17  come back if we have to leave now.

18        THE COURT:  All right.  We'll see everybody back here

19  at 2:00.

20        (Noon recess taken from 12:01 to 2:08 p.m.).

21        THE COURT:  Thank you.  Good afternoon.

22        MS. KRAMER:  Good afternoon.

23        MR. MORRIS:  Good afternoon.

24        THE COURT:  All right.  We're back on the record in the

25  Preliminary Hearing of John Lee.  Is the witness still here?

26        MS. KRAMER:  Your Honor, at the conclusion of testimony

27  this morning, and after Mr. Morris conferred with Mr. Lee, he

28  indicated that he would not have further questions for the

1   witness.

2           THE COURT:  Is that correct, Mr. Morris?

3           MR. MORRIS:  Yes.

4           THE COURT:  All right.  Thank you.  Do you have any

5   additional witnesses?

6           MS. KRAMER:  I do not have additional witnesses;

7   however, I would like to address two exhibits.

8                                   (Whereupon People's Exhibits

9                                   3, copy of AFS report, and 4,

10                                  copy of 4-pg CI&I printout for

11                                  John Lee, were marked

12                                  for identification and

13                                  were received into evidence.)

14          MS. KRAMER:  First, I have marked as People's Exhibit 3

15  an AFS report related to a Springfield Armory .40 caliber

16  pistol with a serial number X, D as in dog, 471029.  There is

17  a stamp certifying that that document is signed by Inspector

18  Jean Luevano.  I would move to admit this under Evidence Code

19  Section 1280/664, People v. Dunlap and People v. Martinez.

20  With regard to People's --

21          THE COURT:  What is the purpose of that Exhibit?

22          MS. KRAMER:  The purpose of that Exhibit is to show

23  that John Lee is not listed in the AFS data base as the

24  registered owner of that pistol that was testified to that had

25  been recovered from the black bag that the defendant had been

26  driving the vehicle in.

27          THE COURT:  Okay.  Next.

28          MS. KRAMER:  People's 4 is a four-page printout, a

1  certified CI & I of the defendant's criminal history,

2  certified by Inspector Mike Beal.  The purpose of this

3  document is to indicate on page 2 that as a condition of a

4  2013 conviction out of Hayward, there was a firearm

5  restriction on the defendant, and I would move to admit this

6  under Evidence Code Sections 1280/664, People v. Dunlap and

7  People v. Martinez.

8           THE COURT:  All right.  Mr. Morris.

9           MR. MORRIS:  As to the exhibits?

10          THE COURT:  Yes.

11          MR. MORRIS:  I submit.

12          THE COURT:  All right.  They will be admitted.  With

13  that, do the People rest?

14          MS. KRAMER:  We do, Your Honor.

15          THE COURT:  Thank you.  Mr. Morris.

16          MR. MORRIS:  No witnesses, Your Honor.  I would like to

17  move my marked exhibits into evidence at this time.

18          THE COURT:  Any objection?

19          MS. KRAMER:  No objection.

20          THE COURT:  They will be admitted.

21                              (Whereupon Defense Exhibits

22                               A-M, previously marked for

23                               identification in Volume 1,

24                               were received into

25                               evidence.)

26          MR. MORRIS:  Thank you.

27          THE COURT:  Now --

28          MS. KRAMER:  And I will be withdrawing People's 1 and

1  these commands, correct?

2  A.    Yelling it.  I wasn't using a loud speaker or anything,
3  no.

4  Q.    I see.  And so once Mr. Lee was about -- what?  Was it
5  45 feet away, that's when you deployed the dog?

6  A.    Yes.

7  Q.    Once you deployed the dog, do you, yourself, run
8  also --

9  A.    Yes.

10  Q.    -- in that direction?  And you did that in that case?

11  A.    I did.

12  Q.    Dog runs faster than you?

13  A.    He does.

14  Q.    So once you deploy the dog, the dog runs full speed at
15  Mr. Lee, right?

16  A.    Yes.  Full speed or not, I don't know, but he runs.

17  Q.    You spent some time with the dog, so you've seen it
18  chase things at full speed, correct?

19  A.    Yes.

20  Q.    So the dog was running just --

21  A.    He was running.

22  Q.    And when you give the signal for apprehension, that's
23  your way to communicate to the dog to bite Mr. Lee.

24  A.    Bite and apprehend, yes.

25  Q.    The dog doesn't really understand the word "apprehend",
26  right?  It's just biting or not biting, right?

27  A.    Correct.

28  Q.    Okay.  While the dog was running after Mr. Lee and Mr.

1 Lee was running, did you see Mr. Lee turn around at any point

2 to look at the dog?

3 A.    No.

4 Q.    He was just running.

5 A.    Running.

6 Q.    And you mentioned yesterday that Mr. Lee eventually got

7 to a fence?

8 A.    Yes.

9 Q.    It was about eight feet tall?

10 A.    Yes.

11 Q.    Where was this fence in relation to the street?

12 A.    He was running north on the street.  It would be on the

13 west side, so if you're running northbound on the street --

14 Q.    Was it like in between two houses or something?

15 A.    No.

16 Q.    Was it protecting an empty lot?

17 A.    I don't know what it protects.

18 Q.    Was it a large section of fence or a short one?

19 A.    Yes.  Long section.

20 Q.    Chain link?

21 A.    Yes.

22 Q.    And when Mr. Lee jumped onto the fence, where were you?

23 How far away were you?

24 A.    Probably 30 feet behind him at that point.

25 Q.    Could you see him?

26 A.    I could.

27 Q.    Was the area reasonably well illuminated?

28 A.    There were street lights in the area.  Um, wasn't real

1  well lit, no.

2  Q.      And what did he do?  Just jump onto the fence as if he

3  was going to climb it?

4  A.      Looked like he was starting to climb it.  He turned

5  towards the fence, and his action looked like he was going to

6  start climbing over the fence.

7  Q.      Were his hands and feet on the fence like it was up on

8  the fence at the time the dog arrived?

9  A.      It was as he had just started.  The hand was going up

10  towards the fence.

11  Q.      Could you tell whether his hand was on the fence or

12  just near it?

13  A.      On it.

14  Q.      And once -- I guess that that's approximately when the

15  K-9 arrived?

16  A.      It arrived.

17  Q.      To the immediate presence of Mr. Lee?

18  A.      Yes.

19  Q.      And once the K-9 got there, he jumped up.  The dog

20  jumped up and grabbed Mr. Lee in the right arm?

21  A.      Yes.

22  Q.      All right.  Is that just part of the training of the

23  dog, to grab an appendage?

24  A.      Yes.

25  Q.      Like an arm or leg?

26  A.      Yes.

27  Q.      Is he supposed to grab the arm before the leg or --

28  A.      There's no order of anything he's supposed to grab.

1  Q.    But once the K-9 grabbed Mr. Lee's right arm, the K-9

2  pulled Mr. Lee down to the ground, right?

3  A.    Yes.

4  Q.    What was that like?  A concrete sidewalk?

5  A.    Concrete sidewalk.

6  Q.    And you would consider that, based on your training and

7  experience, a successful apprehension by the dog at that

8  stage, right?

9  A.    Successful being he did his job?

10  Q.    Yeah.

11  A.    Yes.

12  Q.    He bit the subject and took him to the ground.

13  A.    Yes.

14  Q.    In fact, once the dog took Mr. Lee to the ground, the

15  dog continued or kept his grip on Mr. Lee's arm, right?

16  A.    Yes.

17  Q.    In terms of the dog's mouth.

18  A.    Yes.

19  Q.    And that particular bite, as far as you saw, yourself,

20  lasted maybe about 30 or 45 seconds.

21  A.    Yes.

22  Q.    Now, have you worked with a dog in regards to what type

23  of, you know, mouth force the dog deploys on a person?

24  A.    Have I worked with him on that, meaning --

25  Q.    Meaning, are there sort of shallow bites and deep bites

26  and soft bites and hard bites?

27  A.    There's all kinds of different bites.

28  Q.    Well, in terms of when the dog is in apprehension mode.

1  A.      Right.

2  Q.      I guess we should -- actually, we haven't established

3  this.  What kind of dog are we talking about?

4  A.      Belgian Malinois, M-a-l-i-n-o-i-s.

5          THE COURT:  I thought maybe it was a poodle.

6          MR. MORRIS:  Q.  How big is the dog?  Do you know how

7  much it weighs?

8  A.      About 70 pounds.

9  Q.      So I guess my question was, when the dog is in

10 apprehension mode and bites the subject, is it trained to bite

11 with all of its force?

12 A.      I don't know what's going on in terms of how hard he

13 wants to bite.  He's trained to bite.

14 Q.      Have you personally gone through the training with this

15 dog where you wear like a body suit?

16 A.      Yes.

17 Q.      And have the dog bite the body suit?

18 A.      Yes.

19 Q.      I imagine you've never had the dog bite into your

20 flesh.

21 A.      No.

22         MR. MORRIS:  May I approach the witness, Your Honor?

23         THE COURT:  Yes.

24         MR. MORRIS:  Thank you.  Showing opposing Counsel some

25 photographs which have previously been marked as Defense G,

26 H, I, J, K.

27         (DA's perusal of Defense Exhibits G, H, I, J, K).

28         MR. MORRIS:  Approaching the witness.

```
 1          THE COURT:  Yes.
 2          MR. MORRIS:  Q.  I'm showing you, Officer, five
 3   purported photographs.  Can you take a moment to look through
 4   them.
 5   A.     (Complying).
 6   Q.     What do those look like to you?
 7   A.     Those are pictures of Mr. Lee's arm.
 8   Q.     All right.  And do those look like pictures of his
 9   right arm?
10   A.     Yes.
11   Q.     On his right arm in those photographs, do you see any
12   marks?
13   A.     Yes.
14   Q.     What do you see?
15   A.     Puncture wounds.
16   Q.     What do you mean by "a puncture wound"?
17   A.     Open punctures on his skin.
18   Q.     Where some object has penetrated his skin?
19   A.     Yes.
20   Q.     And do those puncture wounds look consistent to you
21   with a bite from your dog?
22   A.     Yes.
23   Q.     All right.  And do you see in each of those photographs
24   multiple small red circle shaped markings which would show
25   where the dog's teeth penetrated Mr. Lee's skin?
26   A.     Yes.
27   Q.     And looking at those pictures, is that consistent with
28   what you, yourself, observed about where your dog was biting
```

1  Mr. Lee?  Do those pictures sort of look like the same area of

2  Mr. Lee's body?

3  A.      Yes.

4  Q.      So that was the first bite, right?

5  A.      Yes.

6  Q.      Once the K-9 took Mr. Lee to the ground, having

7  penetrated his flesh with his teeth, did you arrive physically

8  at the location where the dog and Mr. Lee were?

9  A.      Yes.

10  Q.      And what did you do once you arrived?

11  A.      Officer Aldred and I arrived with Mr. Lee and the dog

12  at about the same time, and that's where we attempted to gain

13  control of him and handcuff him.

14  Q.      In order to gain control of Mr. Lee, did you deliver

15  any strikes to his body?

16  A.      No.

17  Q.      Did you deliver any strikes to his face?

18  A.      No.

19  Q.      Did you kick him at all?

20  A.      No.

21  Q.      So you did not punch him three times in the right

22  side.

23  A.      No.

24  Q.      Did you see Officer Aldred strike Mr. Lee?

25  A.      No.

26  Q.      Never?

27  A.      Nope.

28  Q.      He didn't punch Mr. Lee?

1   A.      No.

2   Q.      Or kick him?

3   A.      I don't know if he did.  I didn't see it.

4   Q.      I see.  Now, I guess maybe I should parse my words more

5   carefully.  When you arrived, you used your own physical

6   strength to try to gain compliance over Mr. Lee, right?

7   A.      Yes.

8   Q.      So you grabbed him at some point.

9   A.      I attempted to grab his left arm, yes.

10  Q.      His right arm was in the mouth of your dog, right?

11  A.      Yes.

12  Q.      And you tried to grab his left arm because his left arm

13  was being used to punch the dog?

14  A.      Yes.

15  Q.      Every time Mr. Lee punched the dog, the dog was biting

16  Mr. Lee, right?

17  A.      Yes.

18  Q.      In other words, Mr. Lee's right arm was in the dog's

19  mouth whenever he used his left arm to punch the dog, right?

20  A.      Yes.

21  Q.      Did it look to you as if Mr. Lee was attempting to get

22  the dog to stop biting his right arm?

23  A.      I don't know what his intentions were.

24  Q.      Did he say anything?  Mr. Lee, did he say "ouch"?

25  A.      I don't remember if he did or not.

26  Q.      Did he say, "Could you get this dog off of me?"

27  A.      I don't remember.

28  Q.      Did he say "I submit"?

1 patrol vehicle to you, or do you not even have to look?  You

2 just know it's automatic?

3 A.      I know he's coming.  I saw him in my peripheral.  I

4 wasn't focused on him.  When I call him to me, I know he'll

5 come.

6 Q.      But your focus was on the person crawling out of the

7 car.

8 A.      Yes.

9 Q.      Once your dog reached your side, how far was the person

10 in terms of getting out of the car?

11 A.      He had already got on his feet and was now starting to

12 run as my dog came to my side.

13 Q.      So as the person was crawling out of the car, did you

14 position yourself at a position of advantage such that once

15 the person came out of the car, he would be confronted by

16 you?

17 A.      I'm not sure -- you're asking where I was in relation

18 to where he was when he got out of the car?

19 Q.      In relation to the area that he was crawling out of.

20 He was crawling over, like, this smashed window area, right?

21 A.      Right.

22 Q.      So did you position yourself a few feet outside of that

23 window area?

24 A.      No.  At that point, I was still behind the car.

25 Q.      Okay.

26 A.      What would be the trunk area of the car, the rear end.

27 Q.      So you're still -- were you still moving into position?

28 Were you walking?

1  A.      Slowly moving around inside.

2  Q.      With your gun drawn?

3  A.      Yes.

4  Q.      And your flashlight out?

5  A.      Yes.

6  Q.      So by the time you made it to the passenger's side,

7  fully, the person was already out.  Would that be fair to say

8  or not?

9  A.      By the time I started to walk around and get a full

10  view of the passenger's side, he had already got up and

11  started running.

12  Q.      Okay.  Now, can you describe the person's gait while

13  they're running, whether they had broken into a full speed

14  run?

15  A.      They broke into a full run, sprint, just running away.

16  Q.      Did he look at you at all?

17  A.      I don't know if he did or not.

18  Q.      At that point, did you say anything when he started

19  running?

20  A.      I told him "stop".

21  Q.      When you told him to stop, your dog was already with

22  you?

23  A.      Yes.

24  Q.      When the person got out of the car, could you tell

25  whether he was bleeding?

26  A.      No, I couldn't.

27  Q.      Did you see any visible injuries on him?

28  A.      No.  All I saw was the back side of the person.

1  Q.    Yesterday, we had you explain the tools that you had at

2  your disposal on this particular night, right?

3  A.    Right.

4  Q.    And you mentioned your taser, your pepper spray, your

5  baton, and your K-9, and of course, your firearm.  In terms of

6  a non lethal weapons that you had at your disposal, the taser,

7  pepper spray, and the baton in particular, can you rank those

8  in terms of increasing sort of levels of force?

9         MS. KRAMER:  Objection.  Relevance.

10        THE COURT:  Sustained.

11        MR. MORRIS:  May I be heard, Your Honor?  Maybe we can

12  approach on this.

13        THE COURT:  Okay.

14        (Brief discussion off the record outside of the

15  courtroom between the Court and Counsel).

16        THE COURT:  All right.  That objection is overruled.

17        MR. MORRIS:  Q.  So, Officer, of your non lethal

18  weapons that you had, you've been trained on each of them,

19  right?

20  A.    Yes.

21  Q.    And you've been trained on how to use them.

22  A.    Yes.

23  Q.    And when to use them.

24  A.    Yes.

25  Q.    So can you describe in terms of the weapons you had

26  available to you at the time of this incident, how you rank

27  them in your mind as to increasing levels of force?  Which is

28  the lowest and which is the highest?

1    A.      Are you talking about my taser, my baton, and my pepper

2    spray?

3    Q.      And your K-9.

4    A.      And my K-9? Per our use of force policy, they all fall

5    under the same category, which is intermediate use of force,

6    so they were all equally usable, I guess, at that point.

7    Q.      That's what your training is? That if you have a

8    situation where you can use a taser, it's also reasonable to

9    use a K-9?

10   A.      Depending on the circumstances, yes.

11   Q.      And for you, based on your training and your

12   understanding at this particular time, it was not any more

13   violent to choose a police dog over your other tools.

14   A.      It was a matter of whether it was reasonable or not.

15   Q.      Okay, but I'm not asking whether it was reasonable or

16   not.  I'm asking whether or not it was more violent to use a

17   police dog.

18   A.      No.

19   Q.      Now, the taser you've been trained on -- a taser

20   doesn't leave any physical injuries, right?

21   A.      It can.

22   Q.      Sometimes, it leaves some small probe marks where the

23   taser attaches to the body, but the benefit of the taser,

24   you've been trained on, is that it delivers pain to control

25   the subject but no real lasting injury, right?

26   A.      Depends on the circumstances.

27   Q.      Isn't that what you've been trained? That's what the

28   taser people have trained you. That's why the taser is such a

1  good tool.

2  A.      It can be a good tool.

3  Q.      Are you saying you have not been told that?

4  A.      It can be a good tool.

5  Q.      I understand you think it can be a good tool, but my

6  question is, were you trained by the taser corporation or by

7  your own supervisors through field training or the Police

8  Academy that the benefit of the taser is that it inflicts pain

9  to control the subject but does not inflict injury?

10  A.      It can inflict injury.

11  Q.      Officer, if I could use different words, I will.  My

12  question is, were you trained that -- on that principle?

13  A.      On what principle?  That it doesn't --

14  Q.      That the taser is a good tool because it uses pain to

15  control the subject but doesn't cause serious injury.

16  A.      Well, define "serious injury".

17  Q.      Okay.  So, I've asked now three or four times if you've

18  been trained that.

19  A.      I have.

20  Q.      That's what you've been trained.

21  A.      Right.

22  Q.      That's all I was asking.

23  A.      Okay.

24  Q.      Now, the baton that you used, was it a collapsible

25  baton?

26  A.      Yes.

27  Q.      Not your long wood?

28  A.      No.

1  Q.      The collapsible baton, you're trained to use to inflict

2  pain on the subject in order to gain compliance, correct?

3  A.      Correct.

4  Q.      And you use increasing amounts of force with the baton

5  until you have compliance through pain, right?

6  A.      Correct.

7  Q.      You're not trained to cause injury.  In other words,

8  the purpose of each blow with your baton is not to break a

9  bone or cause a laceration but rather to cause pain to gain

10 control, right?

11 A.      Correct.

12 Q.      And pepper spray, additionally, doesn't cause any

13 serious bodily injury, right?

14 A.      Not to my knowledge, no.

15 Q.      You use pepper spray because it distracts and

16 frustrates and sort of clouds the subject of the force so that

17 you can gain physical control over the person, right?

18 A.      Right.

19 Q.      Now, of all four choices available to you, you agree

20 that the K-9, unlike those other tools, causes -- can cause

21 great bodily injury to the subject, right?

22 A.      Can.

23 Q.      And a K-9 causes that injury by penetrating the

24 person's skin and muscle with its teeth, right?

25 A.      Can, yes.

26 Q.      All right.  Well, in fact, isn't that the only way the

27 K-9 gains physical control of someone, is by using its teeth

28 to bite into the person's flesh?

1  A.      Clothing or flesh, yes.

2  Q.      So once the K-9 is in apprehension mode, the training

3  you've given to the K-9 or you've worked with the K-9 and you

4  received, yourself, is for the K-9 to bite at the person's

5  body, correct?

6  A.      Correct, unless I recall him in the motion of sending

7  him.

8  Q.      Recall him.  You mean like sending him and then telling

9  him to stop.

10  A.      Correct.

11  Q.      Assuming he doesn't stop.  Assuming he makes contact.

12  He's going to bite.

13  A.      Yes.

14  Q.      Now, still sort of having gone through those four

15  options available to you, is it still your answer that you

16  believe a K-9 is in the same level of force as a taser, a

17  baton, or pepper spray?

18  A.      Yes.

19  Q.      You would agree, though, maybe then, that a higher

20  level of force would be your firearm?

21  A.      Yes.

22  Q.      Or is your firearm deployment also just a medium level

23  of force?

24  A.      No.   That's considered lethal force.

25  Q.      Now, before deploying your K-9, you've been trained

26  that you have to give notice to the subject that you are going

27  to send the dog, right?

28  A.      Notice should be given, yes.

1  Q.     Okay.  Well, if I said the training is that you have to

2  give it, you said "should", does that mean that the training

3  is not that you have to but rather that you can, depending on

4  your own discretion?

5  A.     The training is "should", not "shall", so saying that I

6  have to, but saying that I shall, that's not correct.

7  Q.     So you've been trained only that, what?  It's the best

8  practice?

9  A.     Most cases, we should, however, certain scenarios,

10  certain incidents will dictate whether we do or whether we

11  don't give K-9 announcements.

12  Q.     In this particular case, you chose to give an

13  announcement?

14  A.     Yes.

15  Q.     Why did you choose to do that?

16  A.     Because it's my normal practice that I do, even though

17  it says I should, not shall.  My practice is that I do.

18  Q.     And that's an order to give the subject an opportunity

19  to comply --

20  A.     Yes.

21  Q.     -- before getting bitten.

22  A.     Yes.

23  Q.     So what did you say in this case?

24  A.     "Stop or I'll send the dog."

25  Q.     And when you said that, where was the subject?  Where

26  was Mr. Lee?

27  A.     Running, compass-wise, northbound.

28  Q.     How far from you when you issued your first command?

1    A.      He was already about 30 feet in front of me, about the

2    sidewalk.  On the north side of the street.

3    Q.      Were you giving foot chase at that time?

4    A.      No, not yet.

5    Q.      You were standing near the car with your dog?

6    A.      Yes.

7    Q.      Once your dog is out and is in the heel position with

8    you, is it appropriate to give foot chase in that situation?

9    You, yourself?

10   A.      Yes.

11   Q.      Okay.  And what would happen if you started running

12   after the subject?  What is the K-9 supposed to do?

13   A.      If I told him to come with me, he comes with me.  If I

14   tell him to stay, he'll stay.

15   Q.      So when you saw the subject running, you chose not to

16   run after the subject?

17   A.      Not until after my second command.

18   Q.      Have you been trained that in a situation where you

19   have a choice between -- you, yourself -- apprehending a

20   subject or your dog apprehending a subject, that it's better

21   to do it, yourself, or it's better to have the dog do it if

22   you have a choice?

23   A.      Either, or.

24   Q.      In your discretion.

25   A.      Given my training and my experience in the K-9 unit, I

26   will send my dog.

27   Q.      And why is that?

28   A.      Because the reasons dictated in my report, in the

1 bullet points, are the reasons why I chose to send him.

2 Q.    No.   I understand that in this case.   I'm asking just

3 as your general practice, why do you typically send the dog if

4 you, yourself, are available to give chase and try to catch

5 the person?

6 A.    It's safer for officer safety-wise to send my dog.

7 Q.    Safer for the human officer.

8 A.    Correct.

9 Q.    So would it be fair to say that once you had K-9 Rohan

10 out with you, your intention was, if the person fled, to use

11 the dog to try to catch him?

12 A.    If he fled and disobeyed my commands, yes.

13 Q.    You didn't have any intention, once you had the dog

14 out, to try to catch the person, yourself.

15 A.    Not just yet, no.   When you asked "catch him myself",

16 do you mean myself run after him?   Is that what you're asking?

17 Or do you mean catch him, myself.   My primary goal, as in to

18 catch him?

19 Q.    Oh, no.   What I meant by "catch him yourself" is sort

20 of an old fashioned police officer chasing someone and

21 grabbing them and taking them to the ground, that sort of

22 thing.   You've been trained how to do that, right?

23 A.    I've been trained how to do that.

24 Q.    You know how to do that.

25 A.    I do.

26 Q.    You've been trained on certain holds, take-downs,

27 arm-bends, and all that sort of thing.

28 A.    Yes.

1   Q.     You also talked yesterday about your own physical state
2 at the end of a chase. Your adrenaline is pumping, right?
3   A.     Yes.
4   Q.     And you are exited, right?
5   A.     The adrenaline is pumping.
6   Q.     And just, physically, your body is excited. Your heart
7 is racing.
8   A.     Yes.
9   Q.     You also talked yesterday, how, when you're listening
10 to the radio, you're thinking about a potential opportunity
11 where your dog might be useful, right?
12   A.     Yes.
13   Q.     So being on scene in this particular event, seeing this
14 car roll, your own adrenaline pumping, and now seeing a real
15 opportunity to have put your K-9 to use, how do you feel about
16 using your K-9 in that moment?
17   A.     If I have to use him, I will.
18   Q.     But do you use your K-9 in that situation reluctantly,
19 or is it a good opportunity, now that you've been trained with
20 the dog, you lived with the dog -- and gives him a chance to
21 do his job. Do you know what I mean by the difference?
22   A.     I'm not sure what you're asking.
23   Q.     You know, you've talked about, you're very close to the
24 dog, spent a lot of time with the dog, right?
25   A.     Right.
26   Q.     And this dog is trained as your partner. He's trained
27 in apprehension, you work with him on a monthly basis. You've
28 been working with him for 15 months. So when you have the

1  opportunity to deploy the dog, do you have a personal opinion
2  about that moment?
3           MS. KRAMER:  Objection.
4           MR. MORRIS:  It's a bad question.  Let me rephrase.
5  Q.       In the moment, do you feel like that's a -- is it a
6  positive thing for you and an opportunity to have your dog be
7  deployed?
8  A.       You mean do I gain a personal --
9           THE COURT:  Hang on.  Let the DA speak.
10          MS. KRAMER:  Objection.  Relevance as to personal
11 feelings.  I believe what you're getting at is protocol and
12 standards.
13          THE COURT:  And not only that.  It's vague as to time.
14 Are you talking about this time or are you talking about in
15 general?
16          MR. MORRIS:  Let me rephrase.
17          THE COURT:  I think we've already gotten to the end of
18 this.
19          MR. MORRIS:  Q.  This is my last line of inquiry about
20 your own attitude in this particular moment.  I'm talking
21 about in this case, having gone through this long chase with
22 your dog, having previously listened for opportunities to
23 potentially deploy the dog, now having the dog at your side,
24 my question is really about your attitude in the moment.  Is
25 your attitude one of excitement that you have an opportunity
26 to deploy the dog?
27          MS. KRAMER:  Objection.  Relevance as to personal
28 attitude.

```
 1            MR. MORRIS:  May I be heard, Your Honor?

 2            THE COURT:  Sustained.

 3            MR. MORRIS:  Okay.

 4   Q.    Was anyone else making the decision to deploy the dog

 5   in this case?

 6   A.    No.

 7   Q.    Just you, right?

 8   A.    Just me.

 9   Q.    Okay.  So let's go to the dog's deployment.  Mr. Lee

10   was about 25 or 30 feet away from you when you told the dog to

11   apprehend him?

12   A.    No.

13   Q.    How far away was Mr. Lee?

14   A.    Still running at that point, and by then, he had gone

15   from about 30 feet from my first command and was running up

16   the street now, probably about 45 or 50 feet up the street.

17   Q.    And you were stationary.

18   A.    Yes.

19   Q.    And so you gave the command to your dog to apprehend

20   Mr. Lee, right?

21   A.    After my second command.

22   Q.    You gave a second command.  Mr. Lee was beyond 30 feet

23   away, right?

24   A.    Yes.

25   Q.    And you said something like "stop or I'll send the

26   dog."

27   A.    Yes.

28   Q.    You didn't use any amplification of your voice to make
```