1  Gregory M. Fox, State Bar No. 070876
   Joanne Tran, State Bar No. 294402
2  BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
   The Waterfront Building
3  2749 Hyde Street
   San Francisco, California 94109
4  Telephone:     (415) 353-0999
   Facsimile:     (415) 353-0990
5  Email:     gfox@bfesf.com
               jtran@bfesf.com
6

7  Attorneys for Defendant
   DENNIS MALLY
8  (erroneously named as DANNY MALLY)

9

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13

   JOHN HENRY LEE,                    Case No. 4:18-cv-02109-JSW
14
         Plaintiff,
15                                     **DECLARATION OF JOANNE TRAN IN**
   v.                                  **SUPPORT OF DEFENDANT'S MOTION FOR**
16                                     **SUMMARY JUDGMENT**
   DANNY MALLY, DETECTIVE JOHNSON,
17 and DOES 1 through 100

18       Defendants.
                                       **Hon. Jeffrey S. White**
19

20

21       I, Joanne Tran, declare:

22       1.     I am an attorney at law duly licensed to practice law before the courts in the State of

23 California, and I am employed as a Senior Associate with the law firm of Bertrand, Fox, Elliot, Osman &

24 Wenzel, attorneys of record for Defendant Officer DANNY MALLY in the above-captioned matter.  As

25 such, I have personal knowledge of the facts and circumstances surrounding this matter and could, if

26 called, competently testify thereto.

27       2.     Attached as **Exhibit A** is a true and correct copy of court certified Transcript of

28 Preliminary Hearing re *People v. John Henry Lee*, Alameda Superior Court Case No. 593225.

1    3.    Attached as **Exhibit B** is a true and correct copy of court certified Criminal Complaint,

2    *People v. John Henry Lee,* Alameda County Superior Court Case No. 593225-0.

3    4.    Attached as **Exhibit C** is a true and correct copy of court certified First Amended

4    Criminal Complaint, *People v. John Henry Lee,* Alameda County Superior Court Case No. 593225.

5    5.    Attached as **Exhibit D** is a true and correct copy of court certified Information, *People v.*

6    *John Henry Lee,* Alameda County Superior Court Case No. 593225.

7    6.    Attached as **Exhibit E** is a true and correct copy of court certified Transcript re Change of

8    Plea and Report and Sentence, *People v. John Henry Lee,* Alameda County Superior Court Case No.

9    593225.

10    I declare under penalty of perjury under the laws of the State of California that the foregoing is

11    true and correct, and that this declaration was executed on the 30th day of January, 2019 at San

12    Francisco, California.

13

14                              _____*/s/ Joanne Tran*_____
                                          Joanne Tran

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOANNE TRAN IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
*Lee v. Mally, et al.* U.S.D.C. Northern District Case No. 4:18-cv-02109-JSW

EXHIBIT A

# EXHIBIT A

```
1

2

3

4                          IN THE SUPERIOR COURT

5                 STATE OF CALIFORNIA, COUNTY OF ALAMEDA

6                      WILEY W. MANUEL COURTHOUSE

7                       DEPARTMENT NUMBER 114

8              BEFORE THE HONORABLE KIMBERLY BRIGGS, JUDGE

9                               ---oOo---

10    THE PEOPLE OF THE STATE OF CALIFORNIA,)  No. 593225
                                            )
11                            Plaintiff, )
                                            )
12               -vs-                       )
                                            )
13    JOHN HENRY LEE,                       )
                                            )
14                                          )
                                            )
15                            Defendant. )
      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
16

17            R E P O R T E R' S   T R A N S C R I P T

18                      PRELIMINARY EXAMINATION

19                             VOLUME 1

20                          MARCH 25, 2014

21    APPEARANCES:

22    For the People:            KELLY KRAMER,
                                  Deputy District Attorney
23

24    For the Defendant:         SETH MORRIS,
                                  Deputy Public Defender
25

26

27
      Reported by:  Dana Jemme, CSR No. 6882
28
```

```
 1                      MARCH 25, 2014

 2                        ---oOo---

 3          THE CLERK:  Going on the record.  Calling the matters

 4   of John Lee, dockets 593225 and 452140.

 5          Counsel, state your appearances for the record, please?

 6          MS. KRAMER:  Good morning.  Kelly Kramer for the

 7   People.

 8          THE COURT:  Good morning.

 9          MR. MORRIS:  Good morning.  Seth Morris present with

10   Mr. John Lee, who's in custody.

11          THE COURT:  Good morning, Mr. Morris.

12          MR. MORRIS:  Good morning.

13          THE COURT:  All right.  This matter is set for

14   preliminary hearing; is that correct?

15          MS. KRAMER:  Yes, your Honor.

16          MR. MORRIS:  Yes.

17          THE COURT:  Are there any motions that need to be heard

18   before we begin?

19          MS. KRAMER:  No, your Honor.

20          MR. MORRIS:  Only to exclude witnesses who are not

21   testifying but are in the audience.

22          THE COURT:  Granted.

23          MR. MORRIS:  Thank you very much.

24          THE COURT:  All right.  Ms. Kramer?

25          MS. KRAMER:  The People call Andy Choi.

26          THE CLERK:  If you could remain standing, please, and

27   raise your right hand.

28   ///
```

1          ANDY CHOI,

2     Was called to testify

3        by the People:

4     THE WITNESS:  "Yes."

5     THE CLERK:  Thank you.  If you could state your full

6 name for the record and spell both your first and last name.

7     THE WITNESS:  Andy Choi, A-n-d-y C-h-o-i.

8     THE COURT:  Good morning.

9              DIRECT EXAMINATION

10    MS. KRAMER:

11 Q.    Good morning, Mr. Choi.  How old are you?

12 A.    29 years old.

13 Q.    Taking you back to January 15th of 2014, approximately

14 10:20 in the morning, do you recall where you were?

15 A.    Yes.  I was at Oakland Fruitvale BART station.

16 Q.    And what time did you arrive at the BART station?

17 A.    Roughly between 10:00 and 10:15.

18 Q.    Did you arrive in a car or on a BART train?

19 A.    In a car, in a blue Prius.

20 Q.    And did you park your car in the parking lot there at

21 the Fruitvale BART station?

22 A.    Yes, I did.

23    THE COURT:  Okay.  You have to wait until the

24 question --

25    THE WITNESS:  Oh, okay --

26    THE COURT:  No, that's all right.  The court reporter

27 can't take down two people at once and we want to make sure we

28 get everything that's said.

1        THE WITNESS:  Got it.  Understood.

2        THE COURT:  Thank you, Mr. Choi.  Go ahead.

3        MS. KRAMER:  Q.  So Mr. Choi, where did you park your

4    car in the Fruitvale BART station?

5    A.     Between the third and second floor, I believe.  I don't

6    recall the exact stall number, but roughly 481, I believe.

7    Q.     After you parked your car did anything unusual

8    happen?

9    A.     Yes.

10   Q.     What happened?

11   A.     So I walked -- so I got to work -- I got to the station

12   a little bit late, so I was in a rush.  I had a dentist

13   appointment, so I was trying to make it back to the office.  I

14   got out of the car.  I parked like I usually do, you know,

15   pulled my bag out of my trunk, was walking out of the car and

16   was checking E-mails on my phone, and I was -- as I was

17   walking towards the steps -- I usually take the stairs.  I was

18   about 15 to 10 feet away -- you know.  I see a car coming down

19   on my left-hand side.  It's a white Honda Accord, early 90s --

20        MR. MORRIS:  I'm going to interrupt now.  The question

21   has turned into a narrative, or the answer.

22        THE COURT:  That's sustained.

23        MS. KRAMER:  Q.  So after you parked your car and got

24   your items out, you just mentioned a car pulled up.  Can you

25   describe this car?

26   A.     It was a early 90s Honda Accord, white, nothing

27   particular about it, just a standard car.

28   Q.     And why did you notice this car?

1   A.     It was just in a lot.  It was coming down on the

2   left-hand side, you know, and I was just walking towards the

3   stairs and I was checking my E-mails on the phone.  I just

4   kind of looked to the left.

5   Q.     And did you come into contact with the driver of this

6   Honda?

7   A.     Yes.

8   Q.     How?

9   A.     So -- I don't remember exactly what he said, but he got

10   my attention, came out of the car, had a gun pulled out on

11   me.

12   Q.     Now, when you say he had a gun pulled out on you, how

13   was he holding it?

14   A.     Just straight up, pointing straight at me.

15   Q.     Do you recall which hand it was in?

16   A.     I don't know exactly.  If I -- I were to guess, I would

17   say his left.

18   Q.     And when he got out of the car did he walk up to you?

19   A.     Yes.

20   Q.     How close did he get?

21   A.     About three feet, two, three feet.

22   Q.     Did he say anything to you?

23   A.     I mean, to ask asking me for everything.  I had pretty

24   much my bag and everything else.

25   Q.     And what did you have on you at that time?

26   A.     I had a lot.  I had my phone, I had my work bag, I had

27   a bunch of stuff in my work bag, I had my wallet, my keys.

28   Q.     What was in your bag?

1  A.     My laptop was actually not in it.  I had work files.  I

2  mean, to get specific, I had my lunch in there, I had a couple

3  of gift cards from the holiday season, I had a portable

4  charger, I had a Cartier pen in there that was pretty

5  expensive.  I had -- you know -- a hard drive, portable mouse,

6  notepads, notebooks, files.

7  Q.     Now, what was this person wearing?

8  A.     Black hoody, jeans and tennis shoes.

9  Q.     Was the hood on the hoody up or down?

10  A.     Yes, it was -- it was up.

11  Q.     Were you able to see his face?

12  A.     Yes.

13  Q.     Approximately how long were you able to view his

14  face?

15  A.     I think the whole scenario probably lasted maybe a

16  minute and a half, two minutes.

17  Q.     Do you see that person in court today?

18  A.     Yes, I do.

19  Q.     Can you please point him out and tell me what he's

20  wearing?

21  A.     Right there, yellow with a white undershirt.

22         MS. KRAMER:  Your Honor, may the record reflect the

23  witness has identified the defendant?

24         THE COURT:  Yes, the record will so reflect.

25         MS. KRAMER:  Thank you.

26  Q.     Now this gun, can you describe what the gun looked

27  like?

28  A.     It was a handgun, darker gun, metal.  I would guess it

1 was a Sig just because I've seen it in the past, but my

2 knowledge of guns is not that extensive.  I would guess it to

3 be a 9-millimeter, and that's pretty much the extent of my

4 knowledge on it.

5 Q.     After you gave the defendant the items you have in your

6 possession, did he leave?

7 A.     Yeah.  So -- you know -- I was just hesitating or

8 trying to delay the situation hoping that -- you know -- a car

9 or someone else would come by, and he left or he was in the

10 process of leaving, you know, came back to get my keys and was

11 asking where my car was located, and I -- you know -- I didn't

12 point it out or anything, but by that time someone came -- you

13 know -- there was another car entering into the lot and that's

14 when I took off.

15 Q.     So you did not indicate where your car was?

16 A.     No.

17 Q.     And where did this other car come from?

18 A.     It was coming from -- you know -- the entrance of the

19 lot, so down behind us where -- you know -- kind of up towards

20 the stairs.  I don't remember what type of car it was or who

21 it was -- you know.  As soon as the car was coming, he looked

22 to look at the car and that's when I just kind of took off.

23 Q.     Where did you go?

24 A.     Went downstairs.  I was hoping that there was a cop car

25 at the bottom floor, because there's like a stall where the

26 cops usually park, because I take BART there all the time and

27 unfortunately they weren't there that day.  They're there

28 almost every other day, and as soon as I didn't see any cars

1 or cops in that area, I just ran straight to the BART window.

2 Q.    And were you able to file a police report?

3 A.    Yes, I was.

4 Q.    Now, at any point were you asked by BART police

5 officers to make an identification of the person who had

6 robbed you?

7 A.    Yes.

8 Q.    When was that?

9 A.    I believe the day after.

10 Q.    And do you recall which officers contacted you?

11 A.    Yes.

12 Q.    Which officers?

13 A.    Detective Maes.

14       THE COURT:  I'm sorry?

15       THE WITNESS:  Detective Maes.

16       THE COURT:  Thank you.

17       MS. KRAMER:  Q.  And what happened when you were

18 contacted by Detective Maes?

19 A.    So I -- you know -- he called me.  He said -- you

20 know -- there's some progress on your case and to meet him at

21 the BART station, so I went over there and he kind of gave me

22 an update on the scenario that someone fitting the description

23 had -- you know -- been in custody, but it's not 100 percent

24 sure or whatever.

25       I forgot exactly -- exactly how he described it, and

26 then he gave me some options as far as to run through some

27 photos to see if it matched the description or a person that

28 was part of my case.

1   Q.      And do you recall if there were any other officers
2   present for the photo lineup?
3   A.      Yes, Detective Johnson, I believe.
4   Q.      Now, as you went through these photographs, how many
5   photographs were you shown?
6   A.      I can't remember exactly what, but five or six.
7   Q.      And can you describe the process that that entailed?
8   A.      It was just one photo at a time and to just -- you
9   know -- I was given just advice just as -- you know -- to take
10  my time, that I don't have to pick any particular photo.  And
11  I asked if I could just kind of see them next to each other
12  and they said no, that's not possible, so I just kind of went
13  through a process of looking at each photo.
14          I went through it maybe two times, two or three times,
15  made a final selection.
16  Q.      And were you able to identify a person whose photo you
17  were shown?
18  A.      Yes.
19  Q.      And how did you know that was the same person?
20  A.      I mean, saw him the day before, so just facial
21  recognition.
22  Q.      And how sure were you that the person whose photo you
23  saw was the same person who robbed you?
24  A.      I would say about 95 percent.
25          MS. KRAMER:  I have nothing further.
26          Thank you, your Honor.
27          THE COURT:  Thank you.  Mr. Morris?
28  ///

1       MS. KRAMER:  Objection, relevance.

2       THE COURT:  Sustained.

3       MR. MORRIS:  Q.  So your attention was drawn to this

4  white car and you saw what you described as a black man get

5  out of it?

6  A.      Yes.

7  Q.      I want to ask you a few questions, if you can, about

8  this person because it sounds like almost immediately you saw

9  a gun?

10  A.      Yes.

11  Q.      How quickly between when the person got out of the car

12  and the person -- well, how quickly after the person got out

13  of the car did you see the gun?

14  A.      Maybe one or two seconds.

15  Q.      When you saw the gun you must have been scared?

16  A.      Yes.

17  Q.      And was it just within a few seconds after seeing the

18  gun that the person spoke to you?

19  A.      I think it was simultaneous.

20  Q.      So sounds like it was a very fast, continuous motion,

21  the person getting out out of the car, showing you a gun and

22  saying something to you?

23  A.      I guess.

24  Q.      Well, is it a drawn-out -- was there sort of a

25  drawn-out --

26  A.      No.  I mean, it's not a slow process, by any means.

27  Q.      When you saw the gun, would it be fair to say that you

28  focused your attention on it?

1   A.      I didn't write anything down.

2        MR. MORRIS:  Thank you, your Honor.  Nothing further.

3        THE COURT:  All right.  Thank you.  Any redirect?

4        MS. KRAMER:  No, thank you, your Honor.

5        THE COURT:  May this detective be excused?

6        MS. KRAMER:  Yes, thank you.

7        MR. MORRIS:  Yes.

8        THE COURT:  Thank you very much, Detective.

9        MS. KRAMER:  The People call Officer Mally.

10       THE CLERK:  Officer, if you could stand right here and

11   I'll get you all sworn in.  Please raise your right hand.

12                        DENNIS MALLY,

13                   Was called to testify

14                      by the People

15       THE WITNESS:  "I do."

16       THE CLERK:  Thank you.  If you could state your full

17   name for the record and spell both your first and last name,

18   please.

19       THE WITNESS:  Dennis Mally, D-e-n-n-i-s M-a-l-l-y.

20       THE CLERK:  Thank you.  You may be seated.

21                     DIRECT EXAMINATION

22       MS. KRAMER:

23   Q.    Good afternoon, Officer Mally.

24   A.    Good afternoon.

25   Q.    What is your occupation?

26   A.    Police officer.

27   Q.    And by whom are you employed?

28   A.    City of San Leandro.

1  Q.    Now, if you could just slow down a little bit for the

2  court reporter here.

3        How long have you been an officer with San Leandro?

4  A.    Just about eight years.

5  Q.    Can you briefly describe your training in becoming an

6  officer with San Leandro?

7  A.    I attended a police academy for the Alameda County

8  Sheriff's Office in Dublin from 2005 and graduated in 2006.

9  It was about a seven-month course.

10  Q.    Now, do you currently work with a K-9 dog, Officer?

11  A.    Yes.

12  Q.    And what is the name of the K-9 you work with?

13  A.    Rohan.

14  Q.    Can you describe your training in becoming a K-9,

15  Officer?

16  A.    Training for becoming a K-9 officer included going to

17  K-9 school with him, which is a five-week course, and there's

18  ongoing monthly training which is a minimum of 16 hours per

19  month.

20  Q.    And how long have you been working with K-9 Rohan?

21  A.    About 15 months.

22  Q.    Now, were you working on January 16th, 2014 at

23  approximately 12:13 a.m.?

24  A.    Yes.

25  Q.    Where were you?

26  A.    At that time I was in the area of East 14th Street and

27  Hesperian Boulevard.

28  Q.    And is that in Alameda County?

1   A.      Yes.

2   Q.      Were you in a marked patrol car?

3   A.      Yes.

4   Q.      Were you in full uniform?

5   A.      Yes.

6   Q.      Did anything happen that caught your attention at that

7   time?

8   A.      Yes.

9   Q.      What was that?

10  A.      Officer De Grano broadcast that he was in the area

11  of -- I believe it was Dolores and Bancroft Avenues, and he

12  was trying to stop a car that was starting to take off from

13  him.

14  Q.      Did he provide information about what kind of car he

15  was trying to catch up to?

16  A.      Yes.

17  Q.      What kind of car was that?

18  A.      It was a white Honda Accord.

19  Q.      And did you begin to keep an eye out for this car?

20  A.      Yes.

21  Q.      What did you do?

22  A.      I drove northbound up Bancroft Avenue towards the area

23  of Dolores.

24  Q.      Now, had you received any information from BART earlier

25  in the day on January 15th?

26  A.      Yes.

27  Q.      What was that information?

28  A.      The vehicle that Officer De Grano was now starting to

1  pursue was involved in a robbery earlier in the day.

2       MR. MORRIS:  Object to hearsay; ask the answer be

3  stricken.

4       THE COURT:  Overruled.

5       MS. KRAMER:  Q.  And was a suspect description provided

6  in that BART information?

7  A.     Yes.

8  Q.     What was that description?

9  A.     The suspect description given was a black male about 18

10 to 20 years old, wearing dark clothing.

11 Q.     Were there any more specifics about the person's height

12 or build given?

13 A.     Not that I can remember.

14 Q.     Now, what did you do after getting the call from

15 Officer De Grano?

16 A.     I drove towards the area as the pursuit began.

17 Q.     Now, at any point did you see officers chasing a car

18 that matched the white Honda Accord description?

19 A.     Yes.

20 Q.     Where were you?

21 A.     I was in the area of International Boulevard, which is

22 just East 14th Street, in our city becomes International

23 Boulevard into Oakland at the border and I was about 104th

24 Avenue and International.

25 Q.     And what did you see?

26 A.     At that time I saw a car coming westbound on 104th

27 towards International, which is where I was parked, and there

28 were several other San Leandro marked police patrol cars

1    pursuing the suspect vehicle.

2    Q.    So this car was coming at you?

3    A.    Yes.

4    Q.    And what color was this car?

5    A.    White.

6    Q.    And were you able to tell the make and model?

7    A.    Yes.

8    Q.    What was that?

9    A.    Honda Accord.

10   Q.    Now, from what you could see, were the lights and

11   sirens of the patrol cars following it on --

12   A.    Yes.

13   Q.    And approximately how many patrol cars did you see?

14   A.    I saw at least two or three.

15   Q.    What was traffic like at that time?

16   A.    Traffic conditions, very light.  There were very few

17   cars on the road.

18   Q.    Did the cars appear to be traveling at a high rate of

19   speed or slow rate of speed?

20   A.    Appeared it was a high rate of speed.

21   Q.    Now, did the Honda go past your location?

22   A.    Yes.

23   Q.    Were you able to see the driver when the Honda went

24   past your location?

25   A.    Very briefly.

26   Q.    And what were you able to see?

27   A.    I saw the driver of the car was a black male wearing a

28   dark -- I believe it was a sweatshirt.  It was dark clothing

1    on top.

2    Q.     How far away from the Honda were you when you saw the

3    driver?

4    A.     Maybe 30 feet.

5    Q.     Were you able to tell whether there was anyone else in

6    the car?

7    A.     I didn't see anybody else in the car.

8    Q.     What did you do?

9    A.     I made a U-turn, activated my lights and my siren on my

10   patrol car, and began pursuing the car.

11   Q.     How far behind the white Honda were you?

12   A.     100 to 150 feet.

13   Q.     Were there any cars between yours and the Honda?

14   A.     No.

15   Q.     Were you able to see the license plate number of the

16   Honda?

17   A.     Yes.

18   Q.     What was the license plate number you saw?

19   A.     I believe it was 3, S as in Sam, L as in Lincoln, V as

20   in Victor, 603.

21   Q.     Where did you follow the car?

22   A.     I followed it westbound on 103rd Avenue in Oakland.

23   Q.     And did the car pull over in light of your lights and

24   sirens?

25   A.     No.

26   Q.     Did you continue to follow the car?

27   A.     Yes.

28   Q.     Where did you continue to follow the car?

1   this Honda?

2   A.      An equal distance in regards to?

3   Q.      Let me ask you this.  Are you familiar with the term

4   bumper pacing?

5   A.      Heard of it.  Being familiar?  I'd have to have it

6   explained.

7   Q.      Okay.  How fast did you see your car going on your

8   speedometer?

9   A.      In that area it was about 40 to 50 miles an hour.

10  Q.      And was this Honda going slower, the same speed or

11  faster than your car at that time?

12  A.      The same speed and faster.

13  Q.      Where did you follow the car from there?

14  A.      Followed it down E Street and made a right turn onto, I

15  believe it was 107th or 109th Avenue in the area of Apricot,

16  then it eventually made a southbound turn onto Apricot, which

17  leads back towards San Leandro.

18  Q.      Did you follow the car back into San Leandro?

19  A.      Yes.

20  Q.      And what happened when you got back into San Leandro?

21  A.      Going down Apricot, made a turn onto Park Avenue -- or

22  Park Street, I'm sorry, which runs north and south, and

23  we went down Park Street and making a left turn onto Garcia.

24  Q.      And was this also a residential area?

25  A.      Yes.  There is a residential on the left-hand side if

26  you're going southbound and there's some industrial businesses

27  on the right-hand side mixed in with some high-density

28  housing.

1   Q.      And is this an area that you patrol regularly?

2   A.      Yes.

3   Q.      Are you familiar with the speed limit in that area?

4   A.      Yes.

5   Q.      What is the speed limit in that area?

6   A.      Park Street, I believe it's 35 to 40 miles an hour is

7   one of the two, and then going onto Garcia where it's

8   residential is 25 miles an hour.

9   Q.      And were you able to see your speedometer in that

10  period of time?

11  A.      Yes.

12  Q.      And how fast was your car going in that period of

13  time?

14  A.      Around 40 to 50 miles an hour.

15  Q.      And was the Honda going slower, the same speed or

16  faster?

17  A.      The same speed and faster.

18  Q.      Now, did you continue following the car through San

19  Leandro?

20  A.      Yes.

21  Q.      Where did you go?

22  A.      We went eastbound onto Garcia and past Pershing Street

23  towards East 14th Street.

24  Q.      And what happened when you got to East 14th Street?

25  A.      Failed -- the car I was pursuing failed to stop for the

26  stop sign at East 14th Street and made a left turn onto East

27  14th, which was northbound back towards Oakland.

28  Q.      And did you continue to follow the Honda?

1  A.      Yes.

2  Q.      How far behind it were you at this point?

3  A.      I maintained my distance of about 100 to 150 feet.

4  Q.      And were your lights and sirens still on?

5  A.      Yes.

6  Q.      And were there any cars blocking your view of this

7  Honda at that time?

8  A.      No.

9  Q.      What happened when you followed the car onto East 14th

10 towards Oakland?

11 A.      We continued northbound on East 14th and approached

12 Durant Avenue, which is the border of Oakland and San

13 Leandro.

14 Q.      And did you follow the car back into Oakland?

15 A.      Yes.

16 Q.      Where did you go?

17 A.      Continued northbound, which is now International

18 Boulevard.  We stayed northbound on it, never turned off until

19 we hit the area of Lake Merritt, so we continued northbound.

20 Q.      And are you familiar with the speed limit on

21 International once you enter Oakland at that location?

22 A.      Familiar with it, yes, but the exact speed limits I

23 don't know offhand.

24 Q.      Is it residential or a business area?

25 A.      Businesses.

26 Q.      And approximately how fast was your vehicle going from

27 that stretch of when you entered Oakland on International to

28 Lake Merritt?

1    A.      We reached speeds of 90 miles an hour.

2    Q.      Now, were there other patrol cars involved in the chase

3    of this car while you were 100 to 150 feet behind it?

4    A.      Yes.

5    Q.      Where were they?

6    A.      Behind me.

7    Q.      During that stretch were you what's considered the

8    primary officer on the chase?

9    A.      Yes.

10   Q.      And at any point did any other officers take the

11   primary after you had?

12   A.      No.

13   Q.      What other officers were involved in the chase with

14   you?

15   A.      Officer Aldred, A-l-d-r-e-d.

16   Q.      So what happened after you headed towards Lake Merritt

17   in Oakland?

18   A.      As we continued northbound towards Lake Merritt, the

19   car I was pursuing made a left turn, which I believe -- I

20   think it was East 12th Street.

21   Q.      What happened after it turned onto East 12th Street?

22   A.      We headed towards the downtown area of Oakland and

23   wrapped around a couple of streets.  Offhand, I'd have to

24   check my report to get the street names, but there was a bunch

25   of the downtown streets where the pursuit continued.

26   Q.      What was traffic like as you were pursuing through

27   downtown from Lake Merritt?

28   A.      Traffic was still light.  There were a few cars on the

1    I don't know offhand.

2    Q.    If it would refresh your recollection, please do so.

3    A.    At that point we were at speeds of about 60 miles an

4    hour.

5    Q.    And again, was that Honda still going about the same

6    speed or faster?

7    A.    Yes.

8    Q.    Now this term fishtail, can you describe that?

9    A.    It's just a term.  When a car's swerving back and forth

10   the tail end of the car is swerving back and forth as if it's

11   out of control.

12   Q.    And how far behind the Honda were you when it was

13   fishtailing?

14   A.    When it fishtailed, I applied the brakes on my car to

15   gain a little distance between me and the car in case

16   something happened.  It started to roll, got into an accident,

17   I wanted to create a little space, so I applied the brakes,

18   and at that point my spacing was about 200, maybe 300 feet.

19   Q.    And what happened after you saw the Honda fishtail?

20   A.    They continued eastbound, struck the cyclone fence

21   which was in the median, and then it struck a tree which was

22   just past a cyclone fence still in the median, and then the

23   car began to roll as a result of the accident -- the collision

24   into the tree.

25   Q.    How many times did you see the car roll?

26   A.    Saw it roll about five times.

27   Q.    And when you used the term roll, what do you mean?

28   A.    The car flipped on its roof back on -- back over and it

1  would roll onto its roof on the tires in a consistent pattern
2  of just rolling over.
3  Q.    And where did the car come to rest, on its roof or on
4  its tires?
5  A.    On its roof.
6  Q.    And how was the car positioned?
7  A.    Positioned upside down on its roof.  The front end of
8  the car was facing an easterly position in the westbound
9  lanes.
10 Q.    What did you do after seeing this car come to a rest on
11 its roof?
12 A.    I pulled up with my nose pointed towards the car --
13 sorry -- the nose of my car pointed at that car.
14 Q.    How far away was your car from this car at that time?
15 A.    About 25 feet.
16 Q.    Did you get out of your car?
17 A.    I did.
18 Q.    And what, if anything, did you see inside the Honda
19 that was now on its roof?
20 A.    I saw a driver of the car inside the car still.
21 Q.    And what was he doing?
22 A.    Moving around inside the car.  At that point I wasn't
23 really sure what he was trying to do, but moving around inside
24 the car.
25 Q.    Could you see any other occupants in the car, aside
26 from the driver?
27 A.    No.
28 Q.    Now, what did you observe after you saw him moving

1  around?

2  A.     I walked up towards the car as he was moving around,

3  and as I was walking around behind on the back side of the car

4  towards the what would be passenger's side now, I saw the

5  driver exit the car on the ground, pop up on his feet and

6  began running onto -- I believe it was 8th Avenue, or I'm

7  sorry, 5th Avenue.

8  Q.     How did he get out of the car?

9  A.     Crawled out onto the ground, got onto his feet and

10  started running.

11  Q.     Which window did he crawl out of?

12  A.     He crawled out of the passenger's side window.

13  Q.     Now, as he came out the window did you say anything to

14  him?

15  A.     Yes.

16  Q.     What did you say?

17  A.     Yelled at him to stop.

18  Q.     Did you identify yourself as a police officer?

19  A.     I don't remember if I did or not.   I know I yelled at

20  him to stop.

21  Q.     Were you in a full uniform at that time?

22  A.     Yes.

23  Q.     And did he stop at your yelling?

24  A.     No.

25  Q.     What happened?

26  A.     I yelled at him again to stop or I would send the dog.

27  Q.     And did he stop?

28  A.     No.

1    Q.      What did you do next?

2    A.      I called my partner to me, my K-9 partner, and I gave

3    him -- as suspect was running up 5th Avenue, I gave my K-9

4    partner the command to apprehend.

5    Q.      Now, how far away from you was the driver of the car

6    when you released the K-9 unit?

7    A.      About 30 feet.

8    Q.      And do you see the driver of the car in court today?

9    A.      I do.

10   Q.      Can you please point him out and tell me what he's

11   wearing?

12   A.      Seated to my left wearing yellow.

13          MS. KRAMER:   Your Honor, may the record reflect the

14   witness has identified the defendant?

15          THE COURT:   Yes.

16          MS. KRAMER:   Q.   So did you begin to chase the

17   defendant on foot?

18   A.      Yes.

19   Q.      And what happened after you and the K-9 unit began

20   chasing the defendant?

21   A.      At about that time Officer Aldred pulled up and he and

22   I both began running after the dog and the suspect.

23   Q.      Now, why did you release the K-9 unit on the

24   defendant?

25   A.      I bullet pointed several reasons in my report.   First

26   and foremost, he had committed at that point at least two

27   serious crimes, which was reckless evasion and he was in

28   possession of a stolen vehicle.

1    **Second was that he was running after I gave him**

2    **commands to stop, so he was resisting my efforts to take him**

3    **into custody by running away.**

4    Q.    Now, did Officer Aldred join you in the chase after he

5    arrived?

6    A.    Yes.

7    Q.    And total, how many times did you yell for the

8    defendant to stop?

9    A.    At least twice.

10   Q.    Where did the defendant run?

11   A.    He ran -- compass-wise it would be about northbound

12   onto 5th Avenue.

13   Q.    And what happened when he got onto 5th Avenue?

14   A.    My dog caught up to him.

15   Q.    Where was he when your dog caught up to him?

16   A.    He was just starting to climb a cyclone fence on the

17   west side of the street.

18   Q.    Now, did you see your dog bite the defendant?

19   A.    Yes.

20   Q.    Where on his body did the dog bite the defendant?

21   A.    On his right arm.

22   Q.    And how far up the fence was the defendant when your

23   dog bit him?

24   A.    Not very far.  I think he was just starting to climb it

25   from street level, so I don't think he even made it very far

26   up the fence.

27   Q.    And what happened after you saw the dog bite his right

28   arm?

1   A.      The dog pulled him down to the ground.

2   Q.      And at that point was the defendant resisting your

3   dog's bite?

4   A.      Yes.

5   Q.      How?

6   A.      Began punching my dog with his left hand on my dog's

7   face.

8   Q.      When you say punching, was that with an open fist or a

9   closed fist?

10  A.      With a closed fist.

11  Q.      Approximately how many times did you see the defendant

12  punch your dog?

13  A.      About two times.

14  Q.      Did the punching cause the dog to release?

15  A.      No.

16  Q.      What happened next?

17  A.      Officer Aldred and I caught up to the suspect right at

18  about that time where he started punching my dog in the face,

19  and at that point it was -- we were trying to gain control of

20  him any way we could.

21  Q.      And how did you try and gain control of the defendant?

22  A.      Attempting to grab his legs, control any part of his

23  body.

24  Q.      And what happened when you attempted to gain control of

25  the defendant's body?

26  A.      He began violently resisting us by kicking and punching

27  at us.

28  Q.      Did he kick or punch you?

1  A.    Punched at me, yes.

2  Q.    Did you see him kick or punch Officer Aldred?

3  A.    He kicked at him.  Whether or not contact was made, I

4  don't know.

5  Q.    What happened next?

6  A.    At that point he begins kicking his right leg at my

7  dog, and my dog to defend himself lets go of the suspect's

8  right arm and bites him on the right thigh.

9       MR. MORRIS:  I'm sorry, your Honor, I'm going to object

10 to this officer testifying that the dog was defending itself

11 when he bit my client.  I think that's speculation reading

12 into a dog's mind at this point, unless a foundation could be

13 laid?

14      THE COURT:  Sustained.

15      MR. MORRIS:  Ask that that answer or that portion be

16 stricken.

17      THE COURT:  Granted.

18      MS. KRAMER:  Q.  Are you familiar with the training of

19 your dog in the manner in which they bite a suspect?

20 A.    Yes.

21 Q.    And what is the training with regards specifically to

22 self-defense?

23 A.    If something is being thrown at a dog, say an arm or a

24 leg, that's simply what they're going to go after, what's

25 available to them, so if you're going -- punching at a dog

26 with a hand, a fist, an arm, the dog's most likely going to go

27 after what's available, which would be whatever is being

28 thrown at him.

1   MR. MORRIS:  Objection, your Honor, nonresponsive.  The

2   question was about the officer's training.

3   THE COURT:  Sustained.

4   MR. MORRIS:  Ask that the answer be stricken.

5   THE COURT:  Granted.  Let's take a ten-minute recess.

6   (Recess taken)

7   THE COURT:  We're back on the record in the John Henry

8   Lee matter.  Ms. Kramer?

9   MS. KRAMER:  Thank you, your Honor.

10  Q.    So Officer Mally, focused specifically on your training

11  with your dog, Rohan, what training have you and he received

12  together regarding self-defense?

13  A.    There's the phase of our training that's called Handler

14  Protection which is where he protects me, and that's

15  apprehension and bite work, and that's ongoing training;

16  received about 100 hours of that in K-9 school, and about half

17  of our 16 hours a month is dedicated to bite and apprehension

18  work.

19  Q.    And does that training entail how Rohan is to act when

20  he is being punched or kicked?

21  A.    Yes.

22  Q.    And what specifically did the training include in

23  relation to that?

24  A.    If he's getting bit or kicked, typically what he will

25  do, specific to my dog is if something is hitting him such as

26  a fist or a hand, he's going to bite that.

27  Q.    So when you described the defendant kicking his right

28  leg at Rohan while you and Officer Aldred were trying to

1  detain the defendant, what did you see Rohan do to the

2  defendant's right leg?

3  A.      He bit it.

4  Q.      And based on your training, why do you believe he bit

5  it?

6          MR. MORRIS:  Objection, speculation.

7          THE COURT:  Overruled.

8          THE WITNESS:  Can you repeat the question?  I'm

9  sorry.

10         MS. KRAMER:  Q.  Based on your training with Rohan, why

11 do you believe Rohan bit the defendant's leg when he was

12 kicking it at him?

13 A.      I believe he did it to protect himself from getting

14 kicked.

15 Q.      Now, what happened after you saw Rohan bite the

16 defendant's right leg?

17 A.      After that, after his hands were freed during the

18 struggle we were eventually able to gain control of him and

19 get him handcuffed.

20 Q.      And what happened after the defendant was handcuffed?

21 A.      I immediately gave my dog the command to release his

22 bite, which he did, and I grabbed him by his flat collar which

23 is just his standard patrol collar, and stepped back from the

24 defendant.

25 Q.      And did he comply with your guidance?

26 A.      Yes, he did.

27 Q.      Approximately how long did Rohan's bite last?

28 A.      Bite lasted about 45 to 60 seconds.

| | |
|---|---|
| 1 | MR. MORRIS:  I'm sorry, which bite was that? |
| 2 | MS. KRAMER:  Q.  How long did the bite to the arm last? |
| 3 | A.     About 40, 45 seconds. |
| 4 | Q.     And was the 45 to 60-second bite you just described the |
| 5 | one to the leg? |
| 6 | A.     Total, total time including the arm and the leg. |
| 7 | Q.     Okay, so 40 to 45 seconds was the bite on the arm.  How |
| 8 | long was the bite to the leg? |
| 9 | A.     About 15 seconds. |
| 10 | Q.     Now, after having Rohan move away from the defendant, |
| 11 | did you observe any injuries on Rohan? |
| 12 | A.     No. |
| 13 | Q.     Now, what did you do after the defendant was |
| 14 | handcuffed? |
| 15 | A.     I took my dog back towards my car, which is where I |
| 16 | inspected him.  I just did a visual inspection for any |
| 17 | injuries and didn't find any on him, so I put him back in the |
| 18 | car. |
| 19 | Q.     And did you go back to the Honda Accord at any time? |
| 20 | A.     Yes. |
| 21 | Q.     When did you do that? |
| 22 | A.     I did it as -- it was after I made sure everything was |
| 23 | okay with him being handcuffed, gave medical attention and |
| 24 | leaving, I went back to the car to stand by and wait for the |
| 25 | tow. |
| 26 | Q.     How long after you had seen the defendant run from the |
| 27 | car did you come back to wait for the tow? |
| 28 | A.     Within about two minutes. |

1   Q.      And did you call for the tow?

2   A.      I'm not sure who did.  I believe I called for the tow,

3   but I don't know which officer did.

4   Q.      And were you present when the tow truck arrived?

5   A.      Yes.

6   Q.      What happened when the tow truck arrived?

7   A.      The tow truck driver rolled the car back onto from its

8   roof back onto its tires and it rolled it -- I guess it would

9   be clockwise with -- you're looking at it from the front where

10  it rolled it back onto its wheels, yeah.

11  Q.      And what happened as the car was rolled back onto its

12  tires?

13  A.      A few items fell out of the car.

14  Q.      What were those items?

15  A.      Black duffel-style bag fell out of the car and a

16  carabiner which contained, I believe it was four what I call

17  shaved keys, and I can explain that for you.

18  Q.      Please do.  What are shaved keys?

19  A.      Shaved keys are a term used when keys, typically car

20  keys are filed down to almost make like a skeleton or a master

21  key, and they're typically used by burglars and auto thieves.

22  Q.      And did you pick up the duffel bag?

23  A.      Yes.

24  Q.      Did you look inside?

25  A.      Yes, I did.

26  Q.      What, if anything, did you find?

27  A.      Found a few items, an ID, a payroll check, some other

28  miscellaneous items, and I found a loaded .40-caliber handgun.

1  Q.      And why did you believe this .40-caliber handgun was

2  loaded?

3  A.      I treat every gun that I come into contact with as if

4  it's loaded.

5  Q.      And what did you do to determine whether or not it

6  was?

7  A.      I took the magazine out of the gun and I pulled it back

8  and a .40-caliber round of ammunition came out from the

9  chamber of the gun.

10 Q.      And how many rounds?

11 A.      There were nine in the magazine and one in the chamber,

12 for a total of 10.

13 Q.      Did you see a serial number on the gun?

14 A.      I did.

15 Q.      What was that serial number?

16 A.      Offhand, I don't know the serial number.

17 Q.      Did you provide the serial number to anybody or include

18 it in your report?

19 A.      Yes.

20 Q.      Which one?

21 A.      I read it over my police radio to dispatchers to do a

22 computer records check of the handgun.

23 Q.      Did you read the serial number as you were viewing it?

24 A.      Yes.

25 Q.      I'm going to request that a multipage document held

26 together by a paper clip be marked as People's 2.

27         THE COURT:  All right.

28         (People's 2 was marked for identification)

1  when you first heard?

2  A.    I was sitting in my car when this call first came

3  out.

4  Q.    Certainly, you know Officer De Grano, right?

5  A.    Yes.

6  Q.    He's an officer you work with, right?

7  A.    Right.

8  Q.    Okay.  And had you talked to him earlier that day at

9  all about this BART police investigation from the day before?

10 A.    No.  I don't remember having a discussion with him

11 about it, no.

12 Q.    Had you spoken to any officers about this BART police

13 investigation?

14 A.    No, not that I recall.

15 Q.    You mentioned that you had information that a white

16 Honda Accord may have been involved in a robbery the day

17 before?

18 A.    Yes.

19 Q.    Where did you get that information?

20 A.    The BART Police Department published an informational

21 flier and we had a copy of the flier.

22 Q.    Who's we?

23 A.    San Leandro Police Department.

24 Q.    So did you have a copy of the flier?

25 A.    I didn't have a physical copy myself.  There was one at

26 the station that I saw prior to going out on patrol for my

27 shift.

28 Q.    On the 16th of January?

1   little bit differently to accommodate the dog versus

2   accommodating someone who's in custody.

3   Q.     Right.  But when you're driving fast and maybe going

4   around turns quickly, you have a dog in the back, right?

5   A.     Right.

6   Q.     So it's not ideal for a high-speed chase for -- to have

7   a K-9 officer be the main car, right?

8   A.     I think it's ideal.

9   Q.     Does the dog -- what is the dog doing when you're doing

10  a high-speed chase?  Is he standing up or lying down?  Do you

11  remember?

12  A.     Both.  He stands up, sits, lays down.  I'm not looking

13  back to check what he's doing.

14  Q.     Is he strapped in in any way?

15  A.     No.

16  Q.     If he's standing up is he standing on the seat, the

17  back seat?

18  A.     I guess you consider it the back seat.

19  Q.     Is it modified?

20  A.     It's a flat surface and there is a rubber mat over it

21  to prevent skidding back and forth and just for comfort.

22  Q.     So when you got to the area of East 14th and 104th

23  Street you actually saw the suspect vehicle pass you by; is

24  that right?

25  A.     Yes.

26  Q.     And behind it were a couple of San Leandro police

27  cars?

28  A.     Yes.

1    Q.     The gun itself, was it just loose in the bag?

2    A.     Yes.

3    Q.     Wasn't in a case?

4    A.     No.

5    Q.     And it was loaded?

6    A.     Yes.

7    Q.     Were there sort of different interior compartments of

8    the bag?

9    A.     No.  I think it was just an open interior with no other

10   compartments that I can remember.

11   Q.     All right.  And you yourself rendered the gun safe?

12   A.     Yes.

13   Q.     And unloaded it?

14   A.     Yes.

15   Q.     And did you figure out who that gun was registered

16   to?

17   A.     I did.

18   Q.     Who's that?

19   A.     I don't know offhand.  I don't remember specifically

20   who it was registered to.

21   Q.     Did you contact the gun's owner?

22   A.     I did not.

23   Q.     During the course of the chase, I want to kind of

24   direct our minds back to the chase just for a few minutes.

25        During the course of the chase of the car, throughout

26   the chase from beginning to end, did you maintain sort of an

27   even distance with the car before you applied the brakes when

28   it started fishtailing?

1  around.  Do you see the person's face?

2  A.      The side of it.

3  Q.      Did you look -- did you get close enough to speak with

4  the person?

5  A.      25 feet I could probably make verbal, you know, I can

6  probably make a verbal conversation from there.

7  Q.      Did you say anything at all?

8  A.      No.

9  Q.      Now, were you thinking about at that time whether or

10  not you were going to release the dog?

11  A.      On my mind I wasn't deploying him based on that, based

12  on him just moving in the car, no.

13  Q.      Okay.  But as you got out of your patrol vehicle not

14  knowing what you were going to find, you had on your mind that

15  you might deploy the dog?

16  A.      Yes.

17  Q.      And so did you walk around the car?

18  A.      I did.

19  Q.      So -- and I know it's -- in terms of the angles you had

20  a car on roof, so when you're first arriving looking at the

21  car, what side of the white Honda Accord did you see?

22  A.      I pulled up and I was facing the driver's side.

23  Q.      So you saw the driver's side, but it was upside-down,

24  right, facing you?

25  A.      Yes.

26  Q.      And you were looking inside the driver's window?

27  A.      Yes.  To clarify, the driver's side of the vehicle was

28  facing me.  The car itself, the front end was facing up the

1   street, so I had a clear view of the driver's side of the

2   white car.

3   Q.      Okay, with the front of the white car being closer to

4   you or farther from you?

5   A.      Neither.  I was pretty middle on the car, so as far as

6   the rear end versus front end, equidistant.

7   Q.      Okay, like you were approaching perpendicular to the

8   car; is that right?

9   A.      Walking up towards the driver's side of it.

10  Q.      And then which direction did you go to get around to

11  the other side of the car?

12  A.      The trunk side.

13  Q.      And you went around to the passenger side?

14  A.      Yes.

15  Q.      And why did you do that?

16  A.      I didn't want to be near the engine in case there was

17  some sort of explosion.  There's all kind of fluids leaking at

18  that point, and for me personally, it was safer to approach

19  from the rear.

20  Q.      Did the car look like it was on at that time?  Do you

21  remember?

22  A.      How does a car look when it's on?

23  Q.      Do you remember whether the engine was running?

24  A.      I don't believe it was any more.

25  Q.      When you got around to the passenger's side did you say

26  anything?

27  A.      No.

28  Q.      What did you observe?

1    A.      I saw the way the car was positioned.  I saw the car

2    rolled over, and as I had my flashlight out looking around the

3    passenger's side is when I saw the driver crawl out, which

4    would have been on the roof onto the street, and then he began

5    running.

6    Q.      And he got out from the passenger side or the driver's

7    side?

8    A.      The passenger's side.

9    Q.      Was there an area in your report about that?

10   A.      Yes, there was.

11   Q.      Did you correct that for us?

12   A.      Yes.  In my report I caught it earlier.  I wrote the

13   driver's side, and it was indeed the passenger's side that he

14   crawled out and started running.

15   Q.      So -- but what you saw on the passenger's side side

16   [sic] was what -- it looked like him pulling himself out of

17   the car through a shattered window?

18   A.      The window was broken.

19   Q.      And he was pulling himself out through that window?

20   A.      Pulling or crawling.  He was escaping from the car via

21   the passenger side.

22   Q.      And did you say anything to him when you saw he was

23   getting out of the car?

24   A.      Yes.

25   Q.      What did you say?

26   A.      Told him to stop.

27   Q.      Is this before or after you released the dog?

28   A.      This was after.

1  Q.      Okay.  So you didn't tell him anything verbally until

2  after you released the dog?

3  A.      Correct.  Can I clarify something on that?

4  Q.      Please.

5  A.      In my report, and as I did that night, I pushed the

6  release button which automatically opens the rear passenger

7  side door of my car.  I called the dog to me and he came to a

8  heel position, and all he's trained to do when I call him here

9  is to just come to me.

10          That doesn't mean anything else.  It doesn't mean go

11  find narcotics.  It doesn't mean go apprehend somebody.  When

12  I call him to a heel, he comes to a heel awaiting his next

13  command.

14  Q.      And you did that before issuing any commands to the

15  person inside the car?

16  A.      Yes.

17  Q.      I wanted to ask you about that.  You have a special

18  device, it sounds like.  I never heard of this before.  You

19  have like a garage opener button?

20  A.      Similar to.

21  Q.      And it opens your car door from a distance?

22  A.      It does.

23  Q.      Pops it open?

24  A.      Yes.

25  Q.      And then the dog can just run out?

26  A.      Yes.

27  Q.      Is that something that you and the dog have practice

28  with?

```
 1

 2   STATE OF CALIFORNIA    )
                            )     ss.
 3   COUNTY OF ALAMEDA      )

 4

 5

 6           I, DANA JEMME, Certified Shorthand Reporter, do

 7   hereby certify that I am an Official Reporter of the

 8   Superior Court of the State of California, and that as such I

 9   reported the proceedings had in the above-entitled matter at

10   the time and place set forth herein.

11           That my stenographic notes were thereafter

12   transcribed into typewriting under my direction; and that the

13   foregoing pages numbered 1 through 145 constitute a full, true

14   and correct transcription of my said notes.

15

16

17                      _____Dana M. Jemme_____
                               DANA JEMME, C S R  NO. 6882
18

19

20

21

22

23

24   DATED: 3/31/14

25

26

27

28
```

EXHIBIT B

# EXHIBIT B

Dept. No. 112
In Custody 1/21/14

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
WILEY W. MANUEL COURTHOUSE

FILED
ALAMEDA COUNTY
JAN 21 2014
CLERK OF THE SUPERIOR COURT
By _____
Deputy

| PEOPLE OF THE STATE OF CALIFORNIA | NO. **593225-0** |
|---|---|
| v. | COMPLAINT |
| **JOHN HENRY LEE** | PFN: BIV236    CEN: 4304948 |
| Defendant(s). | **RESTITUTION** 452/40 |

The Undersigned, being sworn says, on information and belief, that JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 15, 2014, commit a Felony, to wit: SECOND DEGREE ROBBERY, a violation of section 211 of the PENAL CODE of California, in that said defendant(s) did unlawfully, and by means of force and fear take personal property from the person, possession, and immediate presence of ANDY CHOI.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Robbery is a violent felony within the meaning of Penal Code Section 667.5(c)(9)."

### PERSONAL USE OF A FIREARM CLAUSE AS TO DEFENDANT JOHN LEE

It is further alleged as to count one, that said defendant JOHN HENRY LEE personally used a firearm within the meaning of Penal Code sections 12022.5(a) and 12022.53(b), and 12022.53(g).

### SPEC ALLEG - NOTICE OF STATE PRISON ELIGIBILITY- VIOLENT FELONY CLAUSE AS TO DEFENDANT JOHN LEE

It is further alleged that the above offense is a violent felony within the meaning of Penal Code section 667.5(c) and that pursuant to Penal Code section 1170(h)(3) an executed sentence for the offenses herein charged shall be served in the state prison.

Pursuant to Penal Code Section 1054.5(b), the People are here by informally requesting that defendant's counsel provide discovery to the People as required by Penal Code Section 1054.3.

Complainant therefore prays that a warrant issue and that said defendant(s) be dealt with according to law.

Subscribed and sworn to before me,

Tuesday, January 21, 2014

_mich__ u mue_ 134_

/s/   Bart Police-1401-2274

_M lij an)_
TERESA C. ORTEGA
Deputy District Attorney
State Bar #169556 TCO/hkm
Alameda County, California

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ALAMEDA
The foregoing instruments are true and
correct copies of the original
on file in this office

NOV 15 2018

ATTEST:
CLERK OF THE SUPERIOR COURT

By I. Baum
Deputy

SUPERIOR COURT OF CALIFORNIA
EUREKA
COUNTY OF ALAMEDA

EXHIBIT C

# EXHIBIT C

Dept. No. 112
PX 2/4/14

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA,
WILEY W. MANUEL COURTHOUSE

**FILED**
ALAMEDA COUNTY

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA | NO. 593225 |
| | FIRST AMENDED COMPLAINT |
| v. | **173615-** |
| **JOHN HENRY LEE** | PFN: BIV236     CEN: 4304948 |

FEB 3 2014

CLERK OF THE SUPERIOR COURT
By _Vono JWof_
Deputy

Defendant(s).

**RESTITUTION**

The Undersigned, being sworn says, on information and belief, that JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 15, 2014, commit a Felony, to wit: SECOND DEGREE ROBBERY, a violation of section 211 of the PENAL CODE of California, in that said defendant(s) did unlawfully, and by means of force and fear take personal property from the person, possession, and immediate presence of ANDY CHOI.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)."

"NOTICE: Robbery is a violent felony within the meaning of Penal Code Section 667.5(c)(9)."

### PERSONAL USE OF A FIREARM CLAUSE AS TO DEFENDANT JOHN LEE

It is further alleged as to count one, that said defendant JOHN HENRY LEE personally used a firearm within the meaning of Penal Code sections 12022.5(a) and 12022.53(b), and 12022.53(g).

### SPEC ALLEG - NOTICE OF STATE PRISON ELIGIBILITY- VIOLENT FELONY CLAUSE AS TO DEFENDANT JOHN LEE

It is further alleged that the above offense is a violent felony within the meaning of Penal Code section 667.5(c) and that pursuant to Penal Code section 1170(h)(3) an executed sentence for the offenses herein charged shall be served in the state prison.

### SECOND COUNT

The Undersigned further deposes and says on information and belief, that said JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 16, 2014, commit a Felony, to wit: EVADING AN OFFICER, WILLFUL DISREGARD, a violation of section 2800.2(a) of the VEHICLE CODE of California, in that said defendant(s) did willfully and unlawfully, while operating a motor vehicle and with the intent to evade, flee and otherwise attempt to elude a pursuing peace officer's motor vehicle while all of the following conditions existed: the peace officer's motor vehicle exhibited at least one lighted red lamp visible from the front and the defendant(s) saw and reasonably should have seen the lamp, the peace officer's motor vehicle was sounding its siren as was reasonably necessary, the peace officer's motor vehicle was distinctively marked, the peace officer's motor vehicle was operated by a peace officer. It is further alleged that the defendant(s) drove with a willful wanton disregard for the safety of persons and property.

### SPEC ALLEG - NOTICE OF STATE PRISON ELIGIBILITY CLAUSE AS TO DEFENDANT JOHN LEE

The defendant is hereby notified that the above felony offense is not governed by Penal Code section 1170(h) and that an executed sentence for the offenses herein charged shall be served in the state prison pursuant to Penal Code section 1170.1(a).

### THIRD COUNT

The Undersigned further deposes and says on Information and belief, that said JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 16, 2014, commit a Felony, to wit: UNLAWFUL DRIVING OR TAKING OF A VEHICLE, a violation of section 10851(a) of the VEHICLE CODE of California, in that said defendant(s) did unlawfully drive and take a certain vehicle, to wit: 1996 HONDA ACCORD, LICENSE #3SLV603, then and there the personal property of NANCY L GEE without the consent of and with intent, either permanently or temporarily, to deprive the said owner of title to and possession of said vehicle.

### FOURTH COUNT

The Undersigned further deposes and says on Information and belief, that said JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 16, 2014, commit a Felony, to wit: RECEIVING STOLEN PROPERTY, MOTOR VEHICLE, a violation of section 496d(a) of the PENAL CODE of California, in that said defendant(s) did unlawfully buy and receive 1996 Honda Accord, License 3SLV603 that was stolen and had been obtained in a manner constituting theft and extortion, knowing the property to be stolen and obtained, and did conceal, sell, withhold, and aid in concealing, selling and withholding said property.

### FIFTH COUNT

The Undersigned further deposes and says on Information and belief, that said JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 16, 2014, commit a Felony, to wit: SECOND DEGREE BURGLARY OF VEHICLE, a violation of section 459 of the PENAL CODE of California, in that said defendant(s) did enter a motor vehicle, to wit: HONDA CIVIC, the property of JAMI HOAI PEREZ, the doors of said motor vehicle being locked, with the intent to commit larceny and any felony.

### SIXTH COUNT

The Undersigned further deposes and says on Information and belief, that said JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 16, 2014, commit a Felony, to wit: CARRYING A LOADED FIREARM ON ONE'S PERSON IN A CITY, a violation of section 25850(a) of the PENAL CODE of California, in that said defendant(s) did unlawfully carry a loaded firearm within a vehicle on his/her person while in a public place and on a public street in an incorporated city, to wit, SAN LEANDRO.

### LOADED FIREARM –PROHIBITED CLASS CLAUSE AS TO DEFENDANT JOHN LEE

It is further alleged, pursuant to section PC25850(c)(4), that the defendant was not in lawful possession of the firearm and is within a class of persons prohibited from possessing or acquiring a firearm pursuant to Sections 12021 and 12021.1 of the Penal Code and Sections 8100 and 8103 of the Welfare and Institutions Code.

### LOADED FIREARM –UNREGISTERED CLAUSE AS TO DEFENDANT JOHN LEE

It is further alleged, pursuant to section 25850(c)(6), that the defendant was not listed with the Department of Justice as the registered owner of the pistol, revolver, and other firearm capable of being concealed upon the person.

## SEVENTH COUNT

The Undersigned further deposes and says on Information and belief, that said JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 16, 2014, commit a Felony, to wit: CARRYING CONCEALED FIREARM WITHIN VEHICLE, a violation of section 25400(a)(1) of the PENAL CODE of California, in that said defendant(s) did unlawfully carry concealed within a vehicle under said defendant's control a pistol, revolver and firearm capable of being concealed upon the person.

### CONCEALED FIREARM–PROHIBITED CLASS CLAUSE AS TO DEFENDANT JOHN LEE

It is further alleged, pursuant to section PC25400(c)(4), that the defendant was not in lawful possession of the firearm and is within a class of persons prohibited from possessing or acquiring a firearm pursuant to  Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of Title 2 of Part 6 of the Penal Code

and Sections 8100 and 8103 of the Welfare and Institutions Code.


### CONCEALED FIREARM WITH AMMUNITION CLAUSE AS TO DEFENDANT JOHN LEE

It is further alleged pursuant to section 25400(c)(6) that the firearm was loaded  and that the defendant was not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106 as the registered owner.

## EIGHTH COUNT

The Undersigned further deposes and says on Information and belief, that said JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 16, 2014, commit a Misdemeanor, to wit: ASSAULT ON A POLICE ANIMAL, a violation of section 600(a) of the PENAL CODE of California, in that said defendant(s) did willfully, maliciously and with no legal justification violate this section with regard to a police animal, K9 Rohan.

**NINTH COUNT**

The Undersigned further deposes and says on Information and belief, that said JOHN HENRY LEE did, in the County of Alameda, State of California, on or about January 16, 2014, commit a Misdemeanor, to wit: BATTERY UPON AN OFFICER AND EMERGENCY PERSONNEL, a violation of section 243(b) of the PENAL CODE of California, in that said defendant(s) did willfully and unlawfully use force and violence upon the person of OFFICER WALTER ALDRED when said defendant(s), knew and reasonably should have known that said person was PEACE OFFICER then and there engaged in the performance of his/her duties.

Pursuant to Penal Code Section 1054.5(b), the People are hereby informally requesting that defendant's counsel provide discovery to the People as required by Penal Code Section 1054.3.

Complainant therefore prays that a warrant issue and that said defendant(s) be dealt with according to law.

Subscribed and sworn to before me,
 Friday, January 31, 2014

INSP Michal P. Brown #310

/s/   Bart Police-1401-2274; San Leandro PD-
2014-2431

EILEEN T. MCANDREW
Senior Deputy District Attorney I
State Bar #120872 cmm
Alameda County, California

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ALAMEDA
The foregoing instruments are true and
correct copies of the original
on file in this office

NOV 1 5 2018

ATTEST:
CLERK OF THE SUPERIOR COURT

By _____
                                    Deputy



EXHIBIT D

# EXHIBIT D

NANCY E. O'MALLEY
District Attorney
900 Courthouse
1225 Fallon Street
Oakland, CA 94612-4292
(510) 272-6222

**FILED**
**ALAMEDA COUNTY**

APR 08 2014

CLERK OF THE SUPERIOR COURT
By _____
                    Deputy

SHARA BELTRAMO
Deputy District Attorney
State Bar #227246

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF ALAMEDA
## RENE C. DAVIDSON COURTHOUSE

PEOPLE OF THE STATE OF CALIFORNIA

v.

**JOHN HENRY LEE**

Defendant.

NO. 173615
INFORMATION

PFN: BIV236        CEN: 4304948

The District Attorney of the County of Alameda by this Information hereby accuses
JOHN HENRY LEE of a Felony, to wit: SECOND DEGREE ROBBERY, a violation of section
211 of the PENAL CODE of California, in that on or about January 15, 2014, in the
County of Alameda, State of California, said defendant did unlawfully, and by means of force
and fear take personal property from the person, possession, and immediate presence of
ANDY CHOI.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code Section
1192.7(c)."

"NOTICE: Robbery is a violent felony within the meaning of Penal Code Section 667.5(c)(9)."

Office of the
District Attorney
Alameda County
California

File Date: 4/8/2014/as

**PERSONAL USE OF A FIREARM CLAUSE AS TO DEFENDANT JOHN LEE**

It is further alleged as to count one, that said defendant JOHN HENRY LEE personally used a firearm within the meaning of Penal Code sections 12022.5(a) and 12022.53(b), and 12022.53(g).

**SPEC ALLEG - NOTICE OF STATE PRISON ELIGIBILITY- VIOLENT FELONY**

**CLAUSE AS TO DEFENDANT JOHN LEE**

It is further alleged that the above offense is a violent felony within the meaning of Penal Code section 667.5(c) and that pursuant to Penal Code section 1170(h)(3) an executed sentence for the offenses herein charged shall be served in the state prison.

**SECOND COUNT**

And the said JOHN HENRY LEE is further accused by the District Attorney of the County of Alameda, by the second count of this Information, of a Felony, to wit: EVADING AN OFFICER, WILLFUL DISREGARD, a violation of section 2800.2(a) of the VEHICLE CODE of California, in that on or about January 16, 2014, in the County of Alameda, State of California, said defendant did willfully and unlawfully, while operating a motor vehicle and with the intent to evade, flee and otherwise attempt to elude a pursuing peace officer's motor vehicle while all of the following conditions existed: the peace officer's motor vehicle exhibited at least one lighted red lamp visible from the front and the defendant saw and reasonably should have seen the lamp, the peace officer's motor vehicle was sounding its siren as was reasonably necessary, the peace officer's motor vehicle was distinctively marked, the peace officer's motor vehicle was operated by a peace officer. It is further alleged that the defendant drove with a willful wanton disregard for the safety of persons and property.

Office of the
District Attorney
Alameda County
California

**SPEC ALLEG - NOTICE OF STATE PRISON ELIGIBILITY CLAUSE AS TO**

**DEFENDANT JOHN LEE**

The defendant is hereby notified that the above felony offense is not governed by Penal Code section 1170(h) and that an executed sentence for the offenses herein charged shall be served in the state prison pursuant to Penal Code section 1170.1(a).

**THIRD COUNT**

And the said JOHN HENRY LEE is further accused by the District Attorney of the County of Alameda, by the third count of this Information, of a Felony, to wit: UNLAWFUL DRIVING OR TAKING OF A VEHICLE, a violation of section 10851(a) of the VEHICLE CODE of California, in that on or about January 16, 2014, in the County of Alameda, State of California, said defendant did unlawfully drive and take a certain vehicle, to wit: 1996 HONDA ACCORD, LICENSE #3SLV603, then and there the personal property of NANCY L GEE without the consent of and with intent, either permanently or temporarily, to deprive the said owner of title to and possession of said vehicle.

**FOURTH COUNT**

And the said JOHN HENRY LEE is further accused by the District Attorney of the County of Alameda, by the fourth count of this Information, of a Felony, to wit: RECEIVING STOLEN PROPERTY, MOTOR VEHICLE, a violation of section 496d(a) of the PENAL CODE of California, in that on or about January 16, 2014, in the County of Alameda, State of California, said defendant did unlawfully buy and receive 1996 Honda Accord, License 3SLV603 that was stolen and had been obtained in a manner constituting theft and extortion, knowing the property to be stolen and obtained, and did conceal, sell, withhold, and aid in concealing, selling and withholding said property.

Office of the
District Attorney
Alameda County
California

-3-

**FIFTH COUNT**

And the said JOHN HENRY LEE is further accused by the District Attorney of the County of Alameda, by the fifth count of this Information, of a Felony, to wit:  SECOND DEGREE BURGLARY OF VEHICLE, a violation of section 459 of the PENAL CODE of California, in that on or about January 16, 2014, in the County of Alameda, State of California, said defendant did enter a motor vehicle, to wit: HONDA CIVIC, the property of JAMI HOAI PEREZ, the doors of said motor vehicle being locked, with the intent to commit larceny and any felony.

**SIXTH COUNT**

And the said JOHN HENRY LEE is further accused by the District Attorney of the County of Alameda, by the sixth count of this Information, of a Felony, to wit:  CARRYING A LOADED FIREARM ON ONE'S PERSON IN A CITY, a violation of section 25850(a) of the PENAL CODE of California, in that on or about January 16, 2014, in the County of Alameda, State of California, said defendant did unlawfully carry a loaded firearm within a vehicle on his/her person while in a public place and on a public street in an incorporated city, to wit, SAN LEANDRO.

**LOADED FIREARM –PROHIBITED CLASS CLAUSE AS TO**

**DEFENDANT JOHN LEE**

It is further alleged, pursuant to section PC25850(c)(4), that the defendant was not in lawful possession of the firearm and is within a class of persons prohibited from possessing or acquiring a firearm pursuant to Sections 12021 and 12021.1 of the Penal Code and Sections 8100 and 8103 of the Welfare and Institutions Code.

Office of the
District Attorney
Alameda County
California

**LOADED FIREARM –UNREGISTERED CLAUSE AS TO DEFENDANT JOHN LEE**

It is further alleged, pursuant to section 25850(c)(6), that the defendant was not listed with the Department of Justice as the registered owner of the pistol, revolver, and other firearm capable of being concealed upon the person.

## SEVENTH COUNT

And the said JOHN HENRY LEE is further accused by the District Attorney of the County of Alameda, by the seventh count of this Information, of a Felony, to wit: CARRYING CONCEALED FIREARM WITHIN VEHICLE, a violation of section 25400(a)(1) of the PENAL CODE of California, in that on or about January 16, 2014, in the County of Alameda, State of California, said defendant did unlawfully carry concealed within a vehicle under said defendant's control a pistol, revolver and firearm capable of being concealed upon the person.

**CONCEALED FIREARM–PROHIBITED CLASS CLAUSE AS TO**

**DEFENDANT JOHN LEE**

It is further alleged, pursuant to section PC25400(c)(4), that the defendant was not in lawful possession of the firearm and is within a class of persons prohibited from possessing or acquiring a firearm pursuant to  Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of Title 2 of Part 6 of the Penal Code and Sections 8100 and 8103 of the Welfare and Institutions Code.

Office of the
District Attorney
Alameda County
California

## CONCEALED FIREARM WITH AMMUNITION CLAUSE AS TO

## DEFENDANT JOHN LEE

It is further alleged pursuant to section 25400(c)(6) that the firearm was loaded and that the defendant was not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106 as the registered owner.

## EIGHTH COUNT

And the said JOHN HENRY LEE is further accused by the District Attorney of the County of Alameda, by the eighth count of this Information, of a Misdemeanor, to wit: ASSAULT ON A POLICE ANIMAL, a violation of section 600(a) of the PENAL CODE of California, in that on or about January 16, 2014, in the County of Alameda, State of California, said defendant did willfully, maliciously and with no legal justification violate this section with regard to a police animal, K9 Rohan.

## NINTH COUNT

And the said JOHN HENRY LEE is further accused by the District Attorney of the County of Alameda, by the ninth count of this Information, of a Misdemeanor, to wit: BATTERY UPON AN OFFICER AND EMERGENCY PERSONNEL, a violation of section 243(b) of the PENAL CODE of California, in that on or about January 16, 2014, in the County of Alameda, State of California, said defendant did willfully and unlawfully use force and violence upon the person of OFFICER WALTER ALDRED when said defendant, knew and reasonably should have known that said person was PEACE OFFICER then and there engaged in the performance of his/her duties.

Office of the
District Attorney
Alameda County
California

1    Pursuant to Penal Code Section 1054(b), the People are hereby informally requesting that

2    defendant's counsel provide discovery to the People as required by Penal Code Section 1054.3.

3

4                                        NANCY E. O'MALLEY
                                         District Attorney
5

6

7                                        By:  SHARA BELTRAMO
                                              Deputy District Attorney
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Office of the
District Attorney
Alameda County
California

-7-

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ALAMEDA
The foregoing instruments are true and
correct copies of the original
on file in this office

NOV 1 5 2018

ATTEST:
CLERK OF THE SUPERIOR COURT

By _____
                                    Deputy



EXHIBIT E

# EXHIBIT E

1

2                    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3                       IN AND FOR THE COUNTY OF ALAMEDA

4                   BEFORE THE HONORABLE THOMAS REARDON, JUDGE

5                           DEPARTMENT NO. 12

6                               ---oOo---                   **CERTIFIED TRANSCRIPT**

7

8    THE PEOPLE OF THE STATE OF                         NO. 173615
     CALIFORNIA,

9
                 PLAINTIFF,

10
                 vs.

11
     JOHN LEE,

12
                 DEFENDANT.

13                                             /

14
                             CHANGE OF PLEA

15

16           REPORT AND SENTENCE - STATE PRISON COMMITMENT

17

18

19                     RENE C. DAVIDSON COURTHOUSE
                       ALAMEDA COUNTY COURTHOUSE

20                        OAKLAND, CALIFORNIA

21                        JANUARY 23, 2015

22                   A P P E A R A N C E S

23   For the People:            NANCY E. O'MALLEY
                                DISTRICT ATTORNEY

24                              BY:  Scott Ford
                                Deputy District Attorney

25

26   For the Defendant:         BRENDON D. WOODS
                                PUBLIC DEFENDER

27                              BY:  Sylvia Cediel
                                Assistant Public Defender

28

1  FRIDAY, JANUARY 23, 2015                    MORNING SESSION

2                        P R O C E E D I N G S

3                        ---oOo---

4          THE COURT:  173615 John Lee who is present in custody

5  with Ms. Cediel, and Mr. Ford for the People.

6      I understand there's a negotiated disposition whereby

7  Mr. Lee is going to plead no contest to the first count of the

8  information, a violation of 211 of the Penal Code, robbery in

9  the second degree, with the understanding that I will find him

10  guilty.  He'll also admit a personal use of a firearm in the

11  course of that event pursuant to 12022.53(b) with the

12  understanding that I will find that to be true as well.

13      He'll be sentenced to the low term of two years state

14  prison on the robbery and ten years use clause for total of 12

15  years in the state prison, which he'll have to serve 85 percent

16  of.

17      He'll have to pay any actual restitution arising from any

18  of the counts, even though they may be dismissed.

19      He'll pay a restitution fund fine of anywhere from to 200

20  to $10,000.  He'll have to provide DNA samples.  There will be a

21  probation investigation fee, court operation fee, and criminal

22  conviction fee.

23      This will be a serious felony strike prior which will have

24  several consequences for Mr. Lee going forward.  It means if

25  he's convicted of any felony in the future, the sentence for

26  that felony may be doubled because of this prior conviction.  If

27  he has or acquires another serious felony strike conviction or

28  juvenile adjudication such that he has two, then any future

1   third serious felony conviction would be a third strike with a

2   minimum sentence of 25 years to life.  In addition to any future

3   serious felony conviction, this prior conviction would add five

4   years.

5       If he's not a citizen of this country, this conviction will

6   result in his deportation, his denial of naturalization, or his

7   exclusion from the country.

8       Mr. Ford, is all that your understanding of the terms of

9   the agreement?

10          MR. FORD:  It is, your Honor.

11          THE COURT:  Ms. Cediel, is that your understanding?

12          MS. CEDIEL:  It is, your Honor.

13          THE COURT:  Most importantly, Mr. Lee, is that your

14  understanding?

15          THE DEFENDANT:  Yes.

16          THE COURT:  I am going to sentence you today.  So

17  never mind what I was about to say.

18      You have a right to be represented by a lawyer at all

19  stages of the proceedings.  If you cannot afford one, one is

20  appointed to represent you, as the court has done, and that

21  right remains with you at all times.

22      Understood?

23          THE DEFENDANT:  Yes.

24          THE COURT:  In this matter you have a right to a jury

25  trial at which the District Attorney's Office would be required

26  to prove the charges against you beyond a reasonable doubt.

27      Understood?

28          THE DEFENDANT:  Yes.

| | |
|---|---|
| 1 | THE COURT:  Do you give that right up? |
| 2 | THE DEFENDANT:  Yes. |
| 3 | THE COURT:  At that proceeding you would have the |
| 4 | right to confront and cross-examine the witnesses against you. |
| 5 | Understood? |
| 6 | THE DEFENDANT:  Yes. |
| 7 | THE COURT:  And do you give that right up? |
| 8 | THE DEFENDANT:  Yes. |
| 9 | THE COURT:  You have a right to produce evidence in |
| 10 | your own defense and use the court's subpoena power in your |
| 11 | behalf. |
| 12 | Understood? |
| 13 | THE DEFENDANT:  Yes. |
| 14 | THE COURT:  Do you give that right up? |
| 15 | THE DEFENDANT:  Yes. |
| 16 | THE COURT:  You have a right to testify if you chose |
| 17 | or to remain silent. |
| 18 | Do you understand those rights? |
| 19 | THE DEFENDANT:  Yes. |
| 20 | THE COURT:  And do you give those rights up? |
| 21 | THE DEFENDANT:  Yes. |
| 22 | THE COURT:  Ms. Cediel, do you join in the waiver? |
| 23 | MS. CEDIEL:  So join. |
| 24 | THE COURT:  I'll find a knowing, voluntary and |
| 25 | intelligent waiver of rights. |
| 26 | Mr. Lee, what is your plea to a violation of 211 of the |
| 27 | Penal Code in the second degree, robbery on or about January |
| 28 | 15th of 2014? |

1       THE DEFENDANT:  No contest.

2       THE COURT:  It's also alleged, sir, in the course of

3  that event you used a firearm as alleged under 12022.53(b).

4  What is your plea to that allegation?

5       THE DEFENDANT:  No contest.

6       THE COURT:  Is there a factual basis for those pleas

7  based upon the discovery and/or preliminary hearing transcript?

8       MS. CEDIEL:  So stipulated.

9       THE COURT:  You'll join in that, Mr. Ford?

10       MR. FORD:  I stipulate to the same.

11       THE COURT:  I'll find Mr. Lee guilty of the first

12  count.  I'll find the clause true pursuant to 12022.53(b).  The

13  balance of the information is dismissed pursuant to this

14  disposition.

15       I understand Mr. Lee wants to be sentenced today, correct?

16       MS. CEDIEL:  That's correct, your Honor.

17       THE COURT:  By law the probation department has to

18  prepare a probation report to go along with you to state prison.

19  If you waive the preparation of that report before I sentence

20  you I can do the sentencing today, and they'll contact you to

21  interview you to prepare the report sometime later.

22       Is that your request, Mr. Lee?

23       THE DEFENDANT:  Yes.

24       THE COURT:  Any legal cause why sentence should not

25  now be pronounced?

26       MS. CEDIEL:  No, your Honor.

27       THE COURT:  All right.  Mr. Lee is sentenced to the

28  low term of two years in the state prison for a violation of

```
 1    Count 1.  In addition and consecutive to that ten years for the
 2    use of the firearm under 12022.53(b), for a total of 12 years in
 3    the state prison at 85 percent.
 4          There will be DNA samples.  I'm going to impose the
 5    restitution fine of the, the minimum by law which is $3,600.
 6    There's an identical fine stayed pending the successful
 7    completion of parole.
 8          There is a $250 probation investigation fee, $40 court
 9    operations fee, $30 criminal conviction fee.
10          I had forgotten to advise Mr. Lee that he will be paroled
11    at some point.  Parole may last as long as four years.  If he
12    violates his parole he could return to prison for as much as one
13    year for each violation.
14          Is all that understood?
15                THE DEFENDANT:  Yes.
16                THE COURT:  And having that in mind, you still waive
17    all your rights and enter the pleas that you did?
18                THE DEFENDANT:  Yes.
19                THE COURT:  All right.  What do you have, deputy?
20                THE BAILIFF:  I know he came in on January 16th of
21    2014.
22                THE COURT:  I have 371 as of today.  But that
23    wouldn't be right if he came in less than a year from today.
24                THE BAILIFF:  January 16.
25                THE COURT:  Oh, January.  I heard February.  My
26    apologies.  So would 371 be correct?  373?
27                THE CLERK:  373.
28                THE COURT:  Right.  Plus 55 for a total of 428.  373
```

1   plus 55 at 15 percent for a total of 428.

2        In regard to actual restitution, did Mr. -- it sounds like

3   Mr. Lee is going to want to waive his appearance on any

4   litigation on that issue because he wants to head on off to

5   prison.  Correct?

6             MR. FORD:  I do have restitution as of April of last

7   year.  There was restitution amounting to $3,184.  I'm not aware

8   of any subsequent restitution at this point.

9             THE COURT:  We should probably set it in Department 2

10  for D-rest.

11            MS. CEDIEL:  Why don't we set that in Department 2.

12  We'll waive his appearance.  He's willing to allow the public

13  defender to appear for him.

14            THE COURT:  Do you agree to that, Mr. Lee?

15            THE DEFENDANT:  Yes.

16            THE COURT:  Thanks.  So whatever Friday at your

17  convenience, Counsel.

18            MS. CEDIEL:  Let's do the 4th in February.

19            THE COURT:  Okay.  In Department 2 for determination

20  of restitution.

21            MS. CEDIEL:  We did have a conversation between the

22  Court, myself, and the district attorney regarding whether or

23  not the Court would be willing to release Mr. Lee on a Cruz

24  waiver so he could be with his family pending sentencing.  The

25  Court denied that request based on the charges.  That was

26  explained to him.  So he chose to be sentenced today.

27            THE COURT:  Okay.  Thanks.

28

1    COUNTY OF ALAMEDA.              )

2                                    )    ss.

3    STATE OF CALIFORNIA             )

4

5         I, DANIELLE DYER, do hereby certify:

6              That I am a Certified Shorthand Reporter in the State

7    of California, in the Superior Court for the County of Alameda,

8    State of California;

9              That I fully and correctly reported the

10   within-entitled matter before the Honorable Thomas Reardon,

11   Judge;

12             That the foregoing pages are a full, true and correct

13   transcription of my shorthand notes taken at the aforementioned

14   time and place to the best of my ability.

15             IN WITNESS WHEREOF, I have hereunto subscribed my

16   name this 3rd day of February, 2015.

17

18

19

20

21

22

23   _____

24        DANIELLE DYER, C.S.R. #12232

25

26

27

28

**CERTIFICATE OF SERVICE**

I, the undersigned, declare that I am employed in the County of San Francisco, California; I am over the age of eighteen years and not a party to the within cause; and my business address is 2749 Hyde Street, San Francisco, California 94109.

I am readily familiar with the practice of Bertrand, Fox, Elliot, Osman & Wenzel with respect to the collection and processing of pleadings, discovery documents, motions and all other documents which must be served upon opposing parties or other counsel in litigation. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

On **January 30, 2019**, I served the following document(s):

**DECLARATION OF JOANNE TRAN IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

on the following interested parties:

| John Henry Lee (CDCR# AW0379 | California Men's Colony |
|---|---|
| California Health Care Facility | John Henry Lee, CDCR# AW0379 |
| P.O. Box 32290 | P.O. Box 8103 |
| Stockton, CA 95213 | San Luis Obispo, CA 93409-8103 |
| *Plaintiff Pro Se* | *Plaintiff Pro Se* |

Said service was performed in the following manner:

(✓)   **BY U.S. POSTAL SERVICE (Mail):** I placed each such document in a sealed envelope addressed at noted above, with first-class mail postage thereon fully prepaid, for collection and mailing at San Francisco, California, following the above-stated business practice, on this date.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed **January 30, 2019,** at San Francisco, California.

_____
Renae Gawsawadikul